CHARLES RICHARDSON AND OTHERS, CLAIMANTS OF THE BARQUE TANGIER, APPELLANTS, *v.* DAVID GODDARD AND OTHERS.

The general rules which regulate the delivery of goods by a carrier, by land or water, explained.

Where the master of a vessel delivered the goods at the place chosen by the consignees, at which they agreed to receive them, and did receive a large portion of them after full and fair notice, and the master deposited them for the consignees in proper order and condition at mid-day, on a week day, in good weather, it was a good delivery according to the general usages of the commercial and maritime law.

The fact that the Governor of the State had appointed a day as a general fast day, did not abrogate the right of the master to continue the delivery of the goods on that day. Holiday is a privilege, not a duty. .

There was neither a law of the State forbidding the transaction of business on that day; nor a general usage engrafted into the commercial and maritime law, forbidding the unlading of vessels on the day set apart for a church festival, fast, or holiday; nor a special custom in the port, forbidding a carrier from unloading his vessel on such a day.

In the absence of these legal restrictions, the master had a right to continue the delivery of the goods on the wharf on a fast day.

THIS was an appeal from the Circuit Court of the United States for the district of Massachusetts.

It was the case of a libel filed in the District Court by Goddard & Pritchard, against the barque Tangier, for the non-delivery of certain bales of cotton shipped at the port of Apalachicola. The barque arrived at Boston, and the cotton was lost under the circumstances mentioned in the opinion of the court. The District Court dismissed the libel, but this decree was reversed by the Circuit Court, and the vessel ordered to pay the amount reported by the assessor. The claimants of the vessel appealed to this court.

The case was argued by *Mr. Shepley* for the appellants, and by *Mr. Cushing* for the appellees.

*Mr. Shepley* said that the question involved might be pre·sented under two aspects.

*First.* Assuming Thursday, April 10, to have been an ordinary working day, can the libel be maintained?

*Second.* If not, then does the fact that Thursday was a fast day maintain it?

I. Upon the first assumption, that Thursday is to be deemed an ordinary working day, the respondents establish a full defence upon this proposition—that before the destruction of the cotton by accidental fire, and before one o'clock, on Thursday, April 10, they had unladen it upon a suitable wharf, and one selected by the libellants, and made it ready for delivery under a full and reasonable notice to the libellants, thus legally tendering a delivery.

Upon the first of these two propositions, *Mr. Shepley* contended that the unlading which was shown to have taken place in this case was such a delivery as terminated the liability of the carrier as carrier, and cited the following authorities:

Story on Bailments, sec. 545.

2 Kent's Com., (6th ed.,) 604, and cases in note.

1 Gray's Rep. 271, Norway Plains Company *v.* Boston and Maine R. R. Co.

Cope *v.* Cordova, 1 Rawle Rep., 203.

Goold *v.* Chapin, 10 Barb. Supreme Court, 612.

Garside *v.* Trent and Mersey Navigation Company, 4 Term Rep., 389.

10 Met., 472.

Fisk *v.* Newton, 1 Denio.

Powell *v.* Myers, 26 Wend., 591.

Angell on Carriers, sec. 313.

With respect to the nature of the delivery, *Mr. Shepley* laid down the following propositions, each of which was sustained by references to the evidence.

I. the place of delivery was a proper one. It was on a wharf usual, and selected by the libellants.

II. The notices given were sufficient for all, and for unlading on Thursday as well as on previous days.

III. Before the fire, the cotton was all unladen, and that of the libellants was separated and so accessibly placed as to make it the duty of the consignee to take charge of it.

The next question is, whether the fact that Thursday was fast day, rendered the act of unlading under notice ineffectual to terminate the carrier's liability.

To show this, it must be made to appear, upon the whole evidence—that is, upon the evidence which the court judicially possesses or notices, and upon the evidence given at the trial—that it is the universal usage in the port of Boston not to unlade goods, not liable to injury by weather, upon the forenoon of fast day, from a vessel whose unlading had begun and been interrupted by the neglect of consignees.

The argument upon which this position is maintained is this—

1. Thursday, April 10, 1856, was *prima fronte* a day proper for the discharge of cargo. The fact that the Governor of Massachusetts recommends it to be observed as a day of fasting, humiliation, and prayer, cannot be judicially known to this court to render it *per se* a day improper for the unlading of a half-discharged vessel.

*Prima fronte* that is a mere recommendation addressed to each man's free will, and which the respondents were legally at liberty to disregard; and as they did disregard it, all their rights remain unaffected under the general law.

The fact that it has been usual for the Governors to make a similar recommendation on other days, for many years, or for two hundred, on or about the same time in the year, does not advance or change the case. Each and all were mere recommendations addressed to each man's free will, which he was at liberty to disregard, and disregarding which, his rights would all remain under the general law.

2. It must appear then to the court, upon the whole evidence, that there is a usage to do no work like this under circumstances like these, to wit, the discharging of a half-discharged cargo under such circumstances as these, so universal as to bind the respondents.

The sources of this evidence are said to be—

*Richardson et al. v. Goddard et al.*

1. The judicial knowledge of the court.

2. The proofs in the cause.

(Upon each of these points, *Mr. Shepley* adduced various. illustrations, and contended that they had a legal right to unlade on a fast day, as no law prohibited it. To strike from the week one of its working days, and compel us to a fast or a rest, to which law does not, a universal usage is demanded.

1 Duer on Ins., 258, 261, 262, 265.

The Paragon, Ware's Rep., 322.)

The proof, so far from establishing such a usage not to unlade, establishes the universal usage to unlade.

The following points of fact are established by numerous witnesses (to whom *Mr. Shepley* referred.)

1. That the discharge of vessels begun to be unladen before fast day continues on that day.

2. Cargoes are moved on that day from the wharf.

3. Labor is generally done on that day by all to whom it is necessary or highly convenient to do it.

4. Expresses, freight and passenger trains, go on that day.

5. It is a working day in all charter-parties.

6. Public worship is not observed.

The proof of the usage respecting fast day is not sufficiently. broad to deprive the master, who has before commenced unlading, of the right to continue it with all the rights he would have had if it had not been fast day. To that extent the unsuitableness of the day fails to be established by the usage, and the master's rights cannot be destroyed by simple proof that it is not usual to receive goods on that day. That usage not to receive does not affect both parties, does not act upon both, and does not deprive the master of the right, under such circumstances, to regard the day as a suitable day for discharging. The master cannot be affected by any usage prevailing among others, which does not reach and control his conduct. Fast day is a suitable day to unlade, unless there be full proof of a usage to prevent it. The usage must be broad enough to affect the conduct of both parties. The established usage, to complete on fast day an unlading commenced before, breaks in upon the usage attempted to be established so far

*Richardson et al.* v. *Goddard et al.*

as to leave the ship-master in the full possession of his rights on that day to act precisely as on any other day.

The practice to unlade on that day, and the custom not to receive, are inconsistent with each other to this extent—that the custom not to receive must fail to be established, so far as it is inconsistent with the right to complete an unlading on fast day, or else such right of unlading is of no 'ffect.

If such a usage as is contended for by ᷣ ₁ ellants be established, it is one which may be waived. It was waived by Solis, the clerk, who had full power to represent the consignees respecting the unlading and delivery as their agent, and he waived all objection to a delivery on fast day.

It is the duty of consignees to remove goods from the place where landed so soon as not to occasion delay, and this they engaged to do in this case, by Solis, their clerk. They neglected to do so, and thereby made it necessary to complete unlading on fast day. They cannot have damages occasioned by fire which would not have injured their property if they had not been guilty of neglect which subjected it to that injury.

*Mr. Cushing* commenced his argument by stating the following general law points:

1. The bills of lading in this case import one full and complete obligation to deliver as well as to carry.

Such is the general law of carriers by sea or land.

Angell on Carriers, sec. 322.

And such is the special law of carriage by sea.

Flanders on Shipping, secs. 507, 513.

See, also, Stevens *v.* Boston and Maine Railroad, 1 Gray, 277.

Parsons on Merc. Law, 202, 207.

Miller *v.* Steam Navigation Co., 13 Bar., 361.

2. The only exception to this rule, in marine carriage, is of perils of the sea.

Fire on the wharf after landing is not within the exception.

Oliver *v.* Memphis Ins. Co., 18 How., 312.

Airey *v.* Merril, 2 Curtis C. C. R. S.

3. Delivery is either actual or constructive.

Actual delivery is to the consignee, or his authorized agent, the deliveree receiving the goods in fact.

Constructive delivery consists of notice, tender, readiness, and present ability to deliver according to the contract, all such conditions being reasonable as to time and place, and so constituting duty to receive.

Addison on Contracts, 798.

Flanders on Shipping, sec. 811.

Angell on Carriers, sec. 323.

4. Unlading and delivery are, or may be, distinct facts, as well in constructive as in actual delivery.

Thus, the fact of landing on a wharf is not necessarily the fact of delivery.

Addison on Contracts, 811, 812.

Flanders on Shipping, 279.

Logs of Mahogany, 2 Sumner, 589.

Ostrander v. Brown, 15 Johnson, 39.

Gibson v. Culver, 17 Wendell, 305.

Fisk v. Newton, 1 Denio, 45.

Angell on Carriers, sec. 300.

5. Separation of the goods to be delivered from others is of the essence of the question of the readiness to deliver, and the duty to receive, so as to establish constructive delivery.

Brittan v. Barnaby, 21 How., 532.

6. Tender of delivery in such quantities, relatively to time, as may make reception and removal for storage practicable, is of the essence of constructive delivery.

Angell on Carriers, secs. 287, 313.

Brittan v. Barnaby, 21 How., 532.

Parsons Merc. Law, 208.

Price v. Powell, 3 Coms. App., 322.

Benson v. Blunt, 1 A. and Ellis, N. S., 270.

7. Due relation of notice of delivery to the time or times of delivery, so as to impose on the consignees no unreasonable consumption of time in the reception of the goods, is of the essence of constructive delivery.

Gatliff v. Bourne, 4 Bing. N. C., 321.

8. Proffer of delivery on and for a lawful day is of the essence of constructive delivery.

Ex. gr. The Lord's day is a statute holiday, on which unnecessary labor is forbidden in most of the countries of Christendom.

So, notice on the Lord's day and landing next morning are bad.

Bourne *v.* Gatliff, 11 Cl. and F., 49.

Generally, *dies festi* (corrupted into *feast* or *fast*, according to taste or occasion)—holidays (days of amusement, or days of sanctity, as the case may be, for the term covers both)—are not days for the execution of contracts.

Chitty on Contracts, (7th Am. ed.,) 721, note.

As to such feast, fast, holy, or holi, days, the following things are to be noted, viz:

(*a.*) In common contracts not negotiable, if day of performance falls due on a holiday, it is performable the next day.

Chitty on Contracts, *ut supra.*

Chitty on Bills, (11th Am. ed.,) 277, note.

Sutton *v.* Burt, 20 Wendell, 205.

Staples *v.* Franklin, 1 Met., 47.

(*b.*) In negotiable contracts, or with grace, the day before.

Story on Prom. Notes, sec. 219.

Chitty on Bills, (11th Am. ed.,) 377 a, note.

(*c.*) National or local usages as to holidays have the same effect as statutes.

Story's Prom. Notes, sec. 222.

Chitty on Bills, (11th Am. ed.,) 378 a, note.

City Bank *v.* Cutler, 3 Pick., 414.

9. In constructive delivery, the conditions of reasonableness are affected, and sometimes determined, by the usage of business, which usage is a question of fact, regulated, however, by legal doctrines.

10. Until such delivery, actual or constructive, the ship's liability under the bill of lading continues.

Story on Bailments, sec. 538.

3 Kent's Com , 163—167.

Price *v.* Powell 3 Com. App., 322.

Miller *v.* Steam Nav. Co., 13 Bar., 361.

Hill *v.* Humphreys, 5 Watts and S., 123.

Harmon *v.* Clark, 4 Camp., 159.

Goold *v.* Chapin, 10 Bar., 612.

Gatliff *v.* Bourne, 4 Bingham's N. C., 314.

S. C., 3 Man. and Gr., 643.

S. C., 11 Clark and F., 45.

Fisk *v.* Newton, 1 Denio, 45.

Thomas *v.* Bos. and Prov. R., 10 Mit., 432.

Lewis *v.* Western Railroad, 11 Mit., 314.

Norway Plains *v.* Bos. and Maine R., 1 Gray, 263.

III. *Particular Points.*—1. It appears proved in the present case, that, so far as any usage exists, to supply the elements of reasonableness in the evidence of constructive delivery, it is, to haul up to some suitable wharf, and land the goods to be received there.

That is conceded to be a lawful usage.

Gatliff *v.* Bourne, 4 Bing. N. C., 314.

In all other respects the general rules remain, as to notice and other circumstances, as already hereinbefore argued, *exemp. gratia.*

(*a.*) Due notice to the consignee or his authorized agent

(*b.*) Separation of the goods.

(*c.*) Practicability of reception and removal.

(*d.*) Due relation of notice and time or times of delivery.

(*e.*) A lawful day.

2. It appears in the present case conclusively that the libellants used all due diligence to take away their goods as soon as the landing commenced, and so long as it continued prior to Thursday.

(*a.*) Libellants' agents and servants worked on Monday, and on Tuesday so long as they could find any cotton.

(*b.*) So far as regards men and teams, and storage, they could have removed all their cotton on Wednesday.

(Three witnesses.)

(*c.*) But the parcels were not separated or set apart by the ship on being landed, and were not according to law made by the master ready for delivery, and so there could be no con-

structive delivery, beyond the actual amount received in part and receipted for by libellants' agent.

See the tesitmony of the same witnesses.

This consideration applies to so much of the cotton burned, if any,-as was landed before Wednesday.

3. Fast day by proclamation is a lawful holiday in Massachusetts, on which libellants were not bound to receive, and therefore all goods landed that day remained at the risk of the ship.

(*a.*) Statutes of Massachusetts, act of 1838, ch. 182, make bills of exchange falling due on fast day payable the day before, with notice of protest the day after.

Act of 1856, ch. 113, (April 15, 1856,) forbids courts. and public-offices to be open on fast day.

(*b.*) It is a *dies non* by immemorial usage in Massachusetts. (Six witnesses.)

It is a much scronger case of *dies non* by usage than that in City Bank *v.* Cutler, 3 Pick., 414, which was of commencement day at Harvard College.

(*c.*) The custom-house is closed. (One witness.)

(*d.*) To make out a case of constructive delivery on fast day, there must have been specific notice of intention to tender delivery that day, and special agreement to receive on that day. None of which appears, but the contrary is in proof.

(*e.*) There was no waiver by libellants of their right of holiday on fast day.

Solis, reception clerk of libellants, gave notice to the officers of the Tangier that he should not receive on fast day. (Four witnesses.)

If it had been otherwise, he would have exceeded his authority, and his acts would not have bound his principal.

4. The limitation, by act of Congress, of the liability of ships, does not apply here.

Limitation is only in case of fire on board the ship.

Compare act of Parliament, 26 Geo. III, c. 86, with act of Congress of March 3, 1851, 9 Stat. at Large, 635.

And see Morewood *v.* Pollok, 18 Eng. L. and Eq., 341.

**IV.** *Conclusion.* 1. There was no actual delivery in this case.

2. The goods were destroyed before the time of lawful reception arrived, and there was no constructive delivery.

3. The ship is therefore liable for the goods.

4. And to the full value.

And the decree of the Circuit Court must be affirmed.

Mr. Justice GRIER delivered the opinion of the court.

The barque "Tangier," a foreign vessel in the port of Boston," is charged in the libel with a failure to deliver certain bales of cotton, according to her contract of affreightment. The answer admits the contract, and alleges a full compliance with it, by a delivery of the cargo on the wharf; and that after such delivery, a part of the cargo was consumed by fire, before it was removed by the consignees.

The libellants amended their libel, admitting the receipt of 163 bales, and setting forth, as a reason for not receiving and taking away from the wharf that portion of the cargo which was unladen on Thursday, "that, by the appointment of the Governor of Massachusetts, that day was kept and regarded by the citizens as 'a day of fasting, humiliation, and prayer,' and that from time immemorial it has been the usage and custom to abstain from all secular work on that day;" and consequently, that the libellants were not bound to receive the cargo on that day; and that such a delivery, without their consent or agreement, is not a delivery or offer to deliver in compliance with the terms of the bill of lading.

Three questions of law were raised on the trial of this case below:

1. Whether the master is exempted from liability for a loss occasioned by accidental fire, after the goods are deposited on the wharf, by the act of Congress of March 3d, 1851.

2. Whether the master is liable, under the circumstances of this case, for the loss of the cotton, on the general principles of the maritime law, excluding the fact of fast day.

3. If not, whether the right of the carrier to continue the discharge of his cargo is affected by the fact that the Governor had appointed that day as a general fast day.

As our decision of the second and third of these points will dispose of this case, we do not think it necessary to express any opinion on the first.

We will first inquire whether there was such a delivery of cargo in this case as should discharge the carrier under this contract of affreightment, irrespective of the peculiar character of the day.

The facts in evidence, so far as they are material to the correct decision of this point, are briefly as follows:

The barque Tangier arrived in the port of Boston on the 8th of April, with a cargo of cotton, intending to discharge at Battery wharf; but at the request of the consignees, and for their convenience, she "hauled up" at Lewis's wharf. She commenced the discharge of her cargo on Monday, the seventh, and on the same day the master gave notice to the consignees of his readiness to deliver the goods. The unlading was commenced in the afternoon, and was continued through the forenoon of Tuesday, when, the cotton not being removed, the wharf became so full that the work was suspended. Notice was again given to the consignees; and they still neglecting to remove their cotton, a third notice was added on Wednesday morning. On the afternoon of that day, all the cotton which had been unladen on Monday and Tuesday was removed, excepting 325 bales, which remained on the wharf over night. On Thursday morning, the wharf was so far cleared that the unlading was completed by one o'clock P. M. On that day, the libellants took away about five bales, and postponed taking the rest till the next day, giving as a reason that it was fast day. About three o'clock of this day, the cotton remaining on the wharf was consumed or damaged by an accidental fire.

The contract of the carrier, in this case, is "to deliver, in like good order and condition, at the port of Boston, unto Goddard & Pritchard."

What constitutes a good delivery, to satisfy the exigency of such a contract, will depend on the known and established usages of the particular trade, and the well-known usages of the port in which the delivery is to be made.

*Richardson et al. v. Goddard et al.*

A carrier by wagon may be bound to deliver his freight at the warehouse of the consignee; carriers by railroad and canal usually deliver at warehouses belonging to themselves or others. Where the contract is to carry by sea, from port to port, an actual or manual tradition of the goods into the possession of the consignee, or at his warehouse, is not required in order to discharge the carrier from his liability as such.

There is no allegation of a particular custom as to the mode and place of delivery, peculiar to the city of Boston, which the carrier has not complied with. The general usages of the commercial and maritime law, as settled by judicial decisions, must therefore be applied to the case. By these, it is well settled that the carrier by water shall carry from port to port, or from wharf to wharf. He is not bound to deliver at the warehouse of the consignee; it is the duty of the consignee to receive the goods out of the ship or on the wharf. But to constitute a valid delivery on the wharf, the carrier should give due and reasonable notice to the consignee, so as to afford him a fair opportunity of providing suitable means to remove the goods, or put them under proper care and custody.

Such a delivery, to be effectual, should not only be at the proper place, which is usually the wharf, but at a proper time. A carrier who would deposit goods on a wharf at night or on Sunday, and abandon them without a proper custodian, before the consignee had proper time and opportunity to take them into his possession and care, would not fulfil the obligation of his contract. When goods are not accepted by the consignee, the carrier should put them in a place of safety; and when he has so done, he is no longer liable on his contract of affreightment.

Applying these principles to the facts of this case, it is clear that (saving the question as to the day) the respondents are not liable on their contract of affreightment for the loss of the goods in question. They delivered the goods at the place chosen by the consignees, and where they agreed to receive them, and did receive a large portion of them, after full and fair notice.

The goods were deposited for the consignees in proper order

and condition, at mid-day, on a week .day, in good weather. This undoubtedly constituted a good delivery; and the carriers are clearly not liable on. their contract of affreightment, unless, by reason of the fact next to be noticed, they were restrained from unlading their vessel and tendering delivery on that day.

II. This inquiry involves the right of the carrier to labor on that day, and discharge cargo, and not the right of the consignee to keep a voluntary holiday, and to postpone the removal of the goods to his warehouse to a more convenient season. The policy of the law holds the carrier to a rigorous liability; and in the discharge of it, he is not bound to await the convenience or accommodate himself to the caprice or conscientious scruples of the consignee. The master of a ship usually has a certain number of lay-days. He is bound to expedite the unlading of his vessel, in order to relieve the owners from the expense of demurrage, and to liberate the ship from the onerous liability of the contract of affreightment as soon as possible. He has six days of the week in which to perform this task, and has a right to demand the acceptance of his freight by the consignee. The consignee may think it proper to keep Saturday as his Sabbath, and to observe Friday as a fast day, or other church festival, or he may postpone the removal of the goods because his warehouse is not in order to receive them; but he cannot exercise his rights at the expense of others, and compel the carrier to stand as insurer of his property, to suit his convenience or his conscience.

Let us inquire, then, first, whether there is any law of the State of Massachusetts which forbids the transaction of business on the day in question; 2dly. If not, is there any general custom or usage engrafted into the commercial or maritime law, and making a part thereof, which forbids the unlading of vessels and a tender of freight to the consignee on the day set apart for a church festival, fast, or holiday; and 3dly. If not, is there any special custom in the port of Boston which prohibits the carrier from unlading his vessel on such a day, and compels him to observe it as a holiday.

1. There is no statute of Massachusetts which forbids the

citizen to labor and pursue his worldly business on any day of the week, except on the Lord's day, usually called Sunday. In the case of Farnum *v.* Fowle, (12 Mass. Rep., 94,) it is said by Chief Justice Parker: "There are no fixed and established holidays in Massachusetts, in which all business is suspended," except Sunday.

2. The observance of Sunday as a Sabbath or day of ceremonial rest was first enjoined by the Emperor Constantine as a civil regulation, in conformity with the practice of the Christian church. Hence it is a maxim of the civil law, "*Diebus dominicis mercari, judicari vel jurari non debet.*" This day, with others soon after added by ecclesiastical authority, (such as "*Dies natalis,*" or Christmas, and "*Pascha,*" or Easter, were called "*Dies festi,*" or "Feriæ," which we call festivals, saints' days, holy days, or holidays. In the thirteenth century, the number of these festivals enjoined by the church was so increased that they exceeded the number of Sundays in the year. The multiplication of them by the church had its origin in a spirit of kindness and Christian philanthropy. Their policy was to alleviate the hardships and misery of predial slaves and the poor laborers on the soil who were compelled to labor for their feudal lords. But afterwards, when these vassals were enfranchised and tilled the earth for themselves, they complained that "they were ruined" by the number of church festivals or compulsory holidays. In 1695, the French King forbid the establishment of any *new* holidays, unless by royal authority; and the church went further, and suppressed a large number of them, or transferred their observance to the next Sunday. (See Dalloz, vol. 29, Tit. "*Jour ferie,*" and 2d Campeaux droit civil, page 168.)

The same observance of these festivals was required by the ecclesiastical authorities as that which was due to Sunday. Men were forbidden to labor or to follow their usual business or employments. But to this rule there were many exceptions of persons and trades, who were not subjected to such observance.

Without enumerating all the exceptions, we may mention that, by the canon law, the observance of these days did **not**

extend " to those who sold provisions; to posts or public con-
veyances; to travellers; to carriers by land or water; *to the
lading and unlading of ships engaged in maritime commerce.*"

Thus we see that in those countries where these holidays
had their origin, and the sanction both of Church and State,
they were not allowed to interfere with the necessities of com-
merce, or to extend to ships, or those who navigate them.
And it would certainly present a strange anomaly, if this
country, in the nineteenth century, should be found re-estab-
lishing the superstitious observances of the dark ages with
*increased rigor*, which both priest and sovereign in the seven-
teenth have been compelled to abolish as nuisances.

In England and other Protestant countries, while a more
strict observance of the Lord's day is enforced by statute, the
other fasts and festivals enjoined by the church have never
been treated as coming within the category of compulsory
holidays. Every man is left free to follow the dictates of his
conscience in regard to them. Formerly their courts sat even
on Sunday; nor were contracts made on that day considered
illegal or void till the statute of 29 Charles 2d, c. 27, was en-
acted, whereby " no person whatever is allowed to do or ex-
ercise any worldly labor or work of their callings on the Lord's
day." But this prohibition was never extended, either by
statute or usage, to other church fasts, festivals, or holidays.
It is true that there are three days in the year, to wit, " Can-
dlemas, Ascension, and St. John the Baptist," in which the
courts do not sit, and the officers are allowed a holiday. But
there is no trace of any decision by their courts that worldly
labor was prohibited on those days, or any usage that ships
should not be unladen and freight delivered and received on
such days. These saints' days and church fasts or festivals
are treated as voluntary holidays, not as Sabbaths of compul-
sory rest.

In the case of Figgins *v.* Willie, (3 Blackstone, 1186,) where
a public officer claimed a right of holiday on the feast day of
St. Barnabas, Chief Justice De Grey says: " I by no means
approve of these self-made holidays; the offices ought to be
open." And in Sparrow *v.* Cooper, (2 Blackstone, 1315,) the

same judge observes, in reference to the same day: "There is no prescriptive right to keep this as holiday. It is not established by any act of Parliament. The boards of revenue, custom-house, and excise, may act as they please, and pay such compliment to their officers and servants as they shall judge expedient by remittting more frequently the hard labor of their clerks, but they are no examples for the court." And the Justices Gould and Blackstone severally observe: "My objection extends to all holidays, as well as St. Barnabas day."

It may be observed, in passing, that there, as well as here, the class of persons most anxious to multiply holidays were the public officers, apprentices, clerks, and others receiving yearly salaries.

It is matter of history that the State of Massachusetts was colonized by men who fled from ecclesiastical oppression, that they might enjoy liberty of conscience, and that while they enforced the most rigid observance of the Lord's day as a Sabbath, or day of ceremonial rest, they repudiated with abhorrence all saints' days and festivals observed by the churches of Rome or of England. They "did not desire to be again brought in bondage, to observe days and months, and times and years." And while they piously named a day in every year which they recommended that Christians should spend in fasting and prayer, they imposed it on no man's conscience to abstain from his worldly occupations on such day, much less did they anticipate that it would be perverted into an idle holiday. The proclamation of the Governor is but a recommendation. It has not the force of law, nor was it so intended. The duties of fasting and prayer are voluntary, and not of compulsion, *and holiday is a privilege, not a duty.* In almost every State in the Union a day of thanksgiving is appointed in the fall of the year by the Governor, because there is no ecclesiastical authority which would be acknowledged by the various denominations. It is an excellent custom, but it binds no man's conscience or requires him to abstain from labor. Nor is it necessary to a literal compliance with the recommended fast day that all labor should cease, and the day be observed

as a Sabbath, or as a holiday. It is not so treated by those who conscientiously observe every Friday as a fast day.

III. Does the testimony in this case show that from time immemorial there has been a well-known usage, having the force and effect of law in Boston, which requires all men to cease from labor, and compels vessels engaged in foreign commerce to cease from discharging their cargoes, and hinders consignees from receiving them?

We do not know this fact judicially, for (except in this case) there is no judicial decision, or course of decisions, in Massachusetts, which establishes the doctrine that carriers must cease to discharge cargo on this day in the port of Boston, but rather the contrary. And after a careful examination of the testimony, we are compelled to say that we find no sufficient evidence of such a peculiar custom in Boston, differing from that of all other commercial cities in the world.

The testimony shows this, and no more: That some persons go to church on that day; some close the windows of their warehouses and shops, and either abstain from work or do it privately; some work half the day, and some not at all. Public officers, school-boys, apprentices, clerks, and others who live on salaries, or prefer pleasure to business, claim the privilege of holiday, while those who depend on their daily labor for their daily bread, and cannot afford to be idle, pursue their occupations as usual. The libellants appear to have had no conscientious scruples on the subject, as they received goods from other ships, and some from this. But the testimony is clear, that however great the number may be who choose to convert the day into a voluntary holiday for idleness or amusement, it never has been the custom that vessels discharging cargo on the wharves of Boston ceased on that day; that like the canon law regarding church festivals and holidays of other countries and former ages, the custom of Boston (if it amount to anything more than that every man might do as he pleased on that day) did not extend to vessels engaged in foreign commerce, or forbid the carrier to continue the delivery of freight on that day.

On the whole, we are of opinion that the barque Tangier

has made good delivery of her cargo to the consignees according to the exigency of her bill of lading, and that the decree of the Circuit Court should be reversed, and the libel dismissed with costs.