### THE JAMES H. HOYT.

### INTERLAKE S. S. CO. v. CARGO OF THE JAMES H. HOYT.

(District Court, E. D. Michigan, S. D. April 1, 1924.)

No. 6632.

1. **Shipping ⬤➞177—Duty of owner of cargo, with reference to unloading of cargo, stated.**

The owner of a cargo, in absence of agreement to contrary, is bound to exercise reasonable diligence in furnishing a place for unloading, and in causing such cargo to be unloaded promptly after notice of its arrival, subject to the usage of the port relative thereto.

2. **Shipping ⬤➞177—Owner not chargeable with demurrage during delay caused by repairs in leg of elevator, while other ship was being unloaded.**

Owner of cargo *held* not chargeable with demurrage during delay caused by unloading of another steamer, which had reached elevator before ship containing owner's cargo, or by repairs in leg of elevator during such unloading.

3. **Shipping ⬤➞177—Owner of cargo liable for demurrage for delay, caused by elevator official's failure to make room for cargo.**

Where there was space in elevator in which to put cargo of corn, but unloading was delayed because of elevator official's failure to employ extra men to shift the grain in the elevator, so as to make room for the cargo, the owner of the cargo was liable for demurrage.

In Admiralty. Libel by the Interlake Steamship Company against 251,000 bushels of No. 2 mixed corn, of the cargo of corn of the steamer James H. Hoyt. Decree for libelant.

Kelley & Cottrell, of Cleveland, Ohio, for libelant.

Miller, Canfield, Paddock & Stone, of Detroit, Mich., for claimant.

TUTTLE, District Judge. The libel in this case alleges that the steamer James H. Hoyt, belonging to libelant, loaded 250,000 bushels of corn in Milwaukee, Wis., for discharge at Port Huron, Mich., under bill of lading in the ordinary lake form, showing that the corn was shipped by Donahue-Stratton Company for export to Europe, forwardance from Port Huron to Montreal; that the Hoyt proceeded to Port Huron, arriving at that place about 4 or 5 p. m. of September 20, 1921, whereupon the shipper and consignee were notified of the vessel's arrival and that she was ready to unload and discharge said cargo; and that through the negligence and inattention of the cargo owner the vessel was unduly delayed, for which damages in the nature of demurrage are claimed.

The answer of Donahue-Stratton Company, claimant of the cargo, admits the shipment of the corn and its arrival at Port Huron, but

alleges delay on the part of the steamer Hoyt in reporting for loading the cargo in Milwaukee, and that the delay in unloading the Hoyt at Port Huron was caused by the failure of the Hoyt to arrive at Port Huron ahead of the steamer Alex B. Uhrig, which said steamer left Milwaukee six hours after the Hoyt and arrived at the elevator at Port Huron ahead of the Hoyt. Claimant also alleges in the answer that the corn was sold by the claimant to be shipped at Montreal for export, and that pursuant thereto claimant made every effort to obtain the requisite number of cars at Port Huron to ship the corn to Montreal. Claimant also denies that it was in any way responsible for the delay in discharging the cargo on the Hoyt, as the unloading of the steamer at Port Huron was in no wise incumbent upon the claimant.

[1] I am satisfied that the contention of claimant that it is not responsible for whatever delay might have arisen in the discharge of the Hoyt's cargo is untenable. The law is that the owner of a cargo, in the absence of agreement to the contrary, is bound to exercise reasonable diligence in furnishing a place for unloading and in causing such cargo to be unloaded promptly after notice of its arrival, subject to the usage of the port relative thereto. Ottawa Transit Co. v. Cargo of Wheat (D. C.) 260 Fed. 493.

The testimony shows that, about the middle of the month of September, 1921, the Donahue-Stratton Company, of Milwaukee, Wis., owner of the cargo, chartered the steamer Hoyt through John Prindiville & Sons, vessel brokers of Chicago, Ill.; John Prindiville & Sons having previously agreed with the Interlake Steamship Company to find employment for one medium-sized steamer per week during the month of September, 1921. The steamer James H. Hoyt was named by the Interlake Steamship Company as being available for carrying the cargo here in question, and under ordinary circumstances would have been in Milwaukee ready for cargo on September 16, 1921, but, due to a breakdown in the machinery of the coal dock where she was unloading the cargo which she had carried just prior to taking the cargo here in question, she did not report for loading in Milwaukee until September 18, 1921. The steamer Alex B. Uhrig also loaded grain at Milwaukee which was consigned to the same elevator at Port Huron, and although the Hoyt finished loading and left Milwaukee six hours ahead of the Uhrig, the latter steamer arrived alongside the elevator at Port Huron ahead of the Hoyt.

The Hoyt arrived at Port Huron September 20th, and did not begin unloading until September 28th at 1 p. m. She did not finish discharging her cargo until the afternoon of October 7th. The testimony of the superintendent of the Port Huron elevator is that 4 days would ordinarily be sufficient in which to discharge the cargo of a vessel the size of the Hoyt, and inasmuch as the Hoyt was at Port Huron approximately 17 days it is incumbent upon the claimant of the cargo to show the reason for this unusual delay.

[2] The testimony satisfies me that the steamer Uhrig reached the elevator ahead of the Hoyt, and therefore under the pleadings, which do not claim the warranty of a free dock in favor of the Hoyt, I must find that the Uhrig, under the testimony, had the right of way and was

entitled to be unloaded ahead of the Hoyt. The cargo of the Uhrig was not discharged until the afternoon of September 27th, and a large part of the time taken up in discharging the Uhrig was occupied in repairing the leg of the elevator which had broken down while the Uhrig was at the dock, and for the delay caused by the broken machinery I cannot hold the Hoyt's cargo.

The Hoyt, under the testimony which seems to me the most convincing, began to unload on the afternoon of September 28th. The explanation of the elevator as to the reason for not beginning to unload the Hoyt as soon as the Uhrig was finished is that the elevator leg, which had been repaired, needed inspection before the unloading of the Hoyt was started, and that the morning of the 28th of September was occupied in such inspection and minor repairs consequent upon such inspection. Hence the delay of a half day during the forenoon of the 28th is satisfactorily explained, so we start the computation of the unloading time of the Hoyt at noon September 28th. The Hoyt was held there the afternoon of the 28th, and all day of the 29th and 30th, of September, and the 1st, 2d, 3d, 4th, 5th, 6th, and until the middle of the afternoon of the 7th of October. And following the testimony of the captain of the Hoyt and the logs of the ship, as to the time the unloading was finished, it appears satisfactorily that it took $9\frac{1}{4}$ days to unload the Hoyt. According to the testimony of the elevator superintendent, referred to above, if the elevator had worked in the ordinary way 10 hours a day, with full crew, running at the usual and accustomed speed, it would probably have taken 4 days to unload the Hoyt. Accordingly there was a delay of $5\frac{1}{4}$ days beyond the customary time, and I so find on that theory.

[3] Now, is that the kind of delay for which the ship can hold the cargo, without a special contract, and without a guaranty on the subject? It seems to me plain from the testimony that there was an abundance of space in the elevator in which to put the Hoyt's cargo. The lessees, whose superintendent was in charge of the elevator, had represented that fact to Prindiville, the broker who had negotiated for the transportation of the corn, and the trouble arose from the fact that the said superintendent of the Port Huron elevator had a different notion as to the elevator's capacity and the amount of free storage space in it than had the lessees at Chicago, who were in actual authority and control of the elevator. These lessees at Chicago had told every one interested that there was plenty of room in the elevator. They told that to Prindiville, the broker, and Prindiville reported the fact to his representative in Cleveland, who in turn advised the owners of the Hoyt of the fact.

The testimony is uncontradicted, and in fact comes from witnesses for the claimant, that there was ample space in the elevator for the Hoyt's cargo of corn, had an effort been made by the elevator to properly distribute other grain, which was in the elevator at the time of the Hoyt's arrival. If those in charge of the elevator had used ordinary diligence, in my opinion the grain already in the elevator would have been shifted in advance of the arrival of the Hoyt, and even after the arrival of the Hoyt it might have been done more promptly. The

lessees of the elevator at Chicago had reported to every one interested that there was room in the elevator, and I find there was actually ample room in the elevator, and I cannot see why the grain in the elevator could not have been shifted in the nighttime, with extra help, if necessary, in order to give the usual capacity for unloading during regular working hours. While all the Hoyt was entitled to was the usual time of unloading, yet when the Port Huron elevator officials permitted the elevator to get into an unusual condition, it would be entirely just and reasonable to expect them to exert themselves to the extent of employing extra men in order to restore the normal conditions and so be ready to unload the ship during the daytime.

As a matter of fact, the cargo owner was more interested in getting the cargo of the Hoyt to Montreal than it was in getting the grain out of the Hoyt and into the elevator. The testimony from one of the cargo owners, Mr. Stratton, is suggestive of the fact that he was figuring on unloading into cars, rather than on using the free space of the elevator. The owners of the cargo wanted to get the corn over to a seaport, and their whole thought was directed toward getting cars, and getting the cars on the way to Montreal, rather than to getting the grain off the ship and into the elevator. The real difficulty and delay resulted from the effort to hold the cargo until these cargo owners could get cars, rather than to use the free space of the elevator. If they had directed their attention at the outset toward getting the ship unloaded, the delay could have been avoided. There is no question but that there was room enough in the elevator to take care of the cargo without using the cars. The men in control of the elevator at Chicago claimed that there was sufficient room and the actual figures of the elevator's capacity, given in the testimony of the elevator's superintendent, lead me to believe that the Hoyt could have been unloaded into the elevator without cars. Hence, inasmuch as it took 9¼ days to unload the Hoyt, I find there was an unnecessary and negligent delay of 5¼ days through the fault of the elevator, for which the cargo and its owner is liable.

Upon the question of the effort made to obtain cars to relieve the situation, I find on this record that there was a car shortage. I find, too, that the elevator and the cargo owners used every reasonable effort to get cars, and I cannot find that they failed in their duty in that regard, but I do find that there was room enough in the elevator, so that the cargo of the Hoyt could have been unloaded. I find that there were 5¼ days of unnecessary delay, for which the ship is entitled to recover against the cargo.

A decree may be drawn accordingly, and a reference to a commissioner provided to ascertain the amount of damages suffered by the libelant, in the event the parties are unable to agree.