RICHARDSON & SONS, Limited, v. JEN-KINS S. S. CO.

No. 5487.

Circuit Court of Appeals, Sixth Circuit.

Nov. 5, 1930.

As Modified on Denial of Rehearing Dec. 11, 1930.

Robert Branand, Jr., of Chicago, Ill. (Charles E. Kremer, Otto M. Hamer, and Donald Campbell, all of Chicago, Ill., on the brief), for appellant.

Carl V. Essery, of Detroit, Mich. (Robert G. McCreary, of Cleveland, Ohio, Warren, Hill & Hamblen, of Detroit, Mich., and Goulder, White & Garry, of Cleveland, Ohio, on the brief), for appellee.

Before DENISON, MOORMAN, and HICKENLOOPER, Circuit Judges.

MOORMAN, Circuit Judge.

This is a libel in rem against a cargo of barley shipped under charter agreement in the barge "Alexander Maitland" from Ft. William, Ontario, to Port Huron, Michigan. The cargo was loaded by the charterer, the McLaughlin Grain Company, Limited. Bills of lading were issued by the master stating that the destination of the grain was Port Huron, Mich., for export to the United Kingdom. The Grand Trunk Elevator was designated in the bills as the care party at Port Huron. The barge arrived at Port Huron in tow and was made fast alongside the Grand Trunk Elevator on December 7, 1924. The unloading of the cargo began the same day and continued, with intervals of suspension at night, until December 9th at 5:15 a. m., when a fire starting in the elevator destroyed it and was communicated to the barge, re-

sulting in damage to the barge and her cargo. About one-fourth of the cargo had been unloaded when the fire occurred. During the progress of the fire it became necessary to move the barge in order to save the cargo. There was no other grain elevator at Port Huron, and the barge was towed a short distance from the elevator dock to a coal dock. The following day libelant formally abandoned the barge to the hull underwriters as a total loss. No advice was received from any of the underwriters, concerning the abandonment except the Glenns Falls Insurance Company, which by letter of January 13, 1925, declined to accept the abandonment. Later, after the libel herein was filed, the several underwriters paid their respective shares of the hull loss. On the day of the fire, and before the abandonment of the barge, libelant made demand on the McLaughlin Company for payment of the freight. Upon the refusal of payment by that company, notice was given to it that a libel would be filed, and the master was instructed to retain the cargo until the freight was paid. Thereafter the McLaughlin Company paid the freight on that part of the cargo that was unloaded before the fire. Shortly after the fire the cargo underwriters took charge of the grain remaining on the barge, and on December 13th made a sale of it to claimants under a bill of sale reciting that "it is understood and agreed by the said grantees that said cargo is sold as is and where is and all expenses in connection with the unloading and taking possession of said cargo, including the expense of moving said vessel from the unloading point to a mooring place within the limits of the harbor of Port Huron, Michigan, and also including any imposts or duties that may be levied against the same shall be borne by said grantees." Prior to the sale representatives of the claimants went aboard the barge, and, without informing the master that they were interested in the grain, asked and received his permission to examine it. On December 14th claimants caused the barge to be towed, with the consent of its master, to another dock where they had prepared means for unloading the remainder of the cargo. The libel was filed December 15th, and the following day the cargo was seized by the United States Marshal. Bond was executed by claimants promptly thereafter and the cargo released and unloaded. The barge was sold by the underwriters on January 20th, and libelant at their request executed to the purchaser a bill of sale. No claim to the unpaid freight involved here has ever been made by the hull underwriters.

The proofs show that the master remained in charge of the barge until January 13, 1925, when he gave up possession to a shipkeeper, who remained aboard until the barge was sold by its underwriters. It appears that the sale of the cargo to claimants was made by an adjuster for the cargo underwriters. There is a dispute in the evidence as to whether claimants had unloaded any part of the cargo at the time the attachment was served. We think the preponderance of evidence shows that they had not. This was the finding of the trial court in sustaining the libel.

It is contended by the claimants that (1) libelant did not earn the freight on the cargo by making delivery thereof according to contract; (2) that it was not in possession of the cargo at the time the libel was issued and had no lien for the freight; (3) that the libel was prematurely filed; and (4) that libelant is estopped from claiming a lien for the freight as against the claimants. The abandonment of the barge by libelant to its hull underwriters forms the basis of all these contentions.

The contract of affreightment was for "safe custody and due transport and right delivery of the cargo," and, as stated, designated as the care party at Port Huron the Grand Trunk Elevator. The evidence shows that the cargo was safely transported to Port Huron and the barge moored alongside the dock of the Grand Trunk Elevator in a position to be unloaded, and that the unloading was commenced, but was interrupted by the fire. The charter and bills of lading were silent as to what would constitute delivery. Upon this point, therefore, the court permitted libelant to make proof of the custom and usage of the port. This, we think, was proper. Richardson, etc. v. Goddard, etc., 64 U. S. (23 How.) 28, 16 L. Ed. 412; Constable v. National Steamship Co., 154 U. S. 51, 14 S. Ct. 1062, 38 L. Ed. 903. It was shown in the proofs that under the port custom it was the duty of the Grand Trunk Elevator, as agent of the cargo owner, to furnish the place for and bear the expense of discharging the cargo, and that the only expense that libelant was bound to bear was the charge made by the elevator for the use of the power shovel or other means for getting the grain to the foot of the elevator leg in the ship. This latter expense the libelant was prepared to pay. Moreover, it moored its barge alongside the elevator in position for unloading and made a tender of delivery according to the custom of the port.

The caretaker actually accepted the delivery after opportunity for inspection and had unloaded a part of the cargo when the fire occurred, and after the fire libelant stood by ready to have the unloading finished until a complete delivery was effected by the claimants' acceptance of the remainder of the cargo on board the barge. We have no doubt that in these circumstances and under the port usage thus shown the libelant earned its freight. The James H. Hoyt (D. C.) 299 F. 666; In re Southern Alberta Co. (C. C. A.) 26 F.(2d) 795; Constable v. National Steamship Company, supra.

The second contention of claimants is based on the ground that libelant was not in possession of the cargo when the libel was filed. It is unquestionably true that a lien on the cargo for the freight will not remain after the shipowner has parted unconditionally with the goods. But the circumstances in this case show, in our opinion, that libelant retained possession of the grain until after the libel was filed. The master of the barge, with other seamen, remained aboard until after the serving of the attachment on the cargo. It is said, however, for claimants that the abandonment of the barge was absolute, relating back to the time of the disaster and constituting the hull underwriters the owner of the property, and that, having parted with the barge, libelant could not retain possession of the cargo, but the master was in possession, not only of the barge, but also of the cargo for the underwriters alone. We may concede that when a loss takes place for which an abandonment is made, the abandonment when accepted or when it finally becomes effective relates back to the date of the disaster. Yet it does not result that a master who remains in charge does so as the agent of the underwriters alone. And it was not so held in the Sarah Ann, Fed. Cas. No. 12,342. It was said in that case that the master "is not exclusively the agent of the original owners of the ship," and, further, that "the common doctrine is that the master is the agent of all concerned in the voyage." In Patapsco Insurance Company v. Southgate, 30 U. S. (5 Pet.) 604, 620, 8 L. Ed. 243, in speaking of the agency of the master, the court said: "He, from necessity, becomes the agent of both parties; and is bound in good faith to act for the benefit of all concerned." Undoubtedly the master, so far as the custody of the vessel was concerned, was the agent of the hull underwriters from the time of the disaster on which the abandonment was based. In the present case, though, the hull underwriters had no concern with the freight,

which was already earned. That belonged to libelant. It is the rule in this country that freight of itself is a subject of insurance. In Mason v. Marine Insurance Co., 110 F. 452, 457, 54 L. R. A. 700 (6 C. C. A.) it was said "that freight already earned at the time of the disaster on account of which the abandonment is made goes to the owner of the ship, or to the insurers of the freight if it be insured." The fact that the title to the hull passed from the libelant does not mean that possession of the cargo was surrendered. The cases which claimants cite on this point [1] do not so hold. The master in charge of the barge was "the agent of all concerned in the voyage." In our opinion he was in possession of the cargo as agent of the libelant, and he remained in such possession until the libel was filed. It is immaterial that libelant sought to recoup the wages of the master and crew from the hull underwriters under the "sue and labor clause" of the hull policies. Its claim under that clause of the policies is based upon an independent contract that has no pertinency to the possession of the cargo.

Nor is there any merit in the contention that the libel cannot be sustained because it was filed before the cargo had been actually unloaded and delivered. If there were a factual basis for this claim, it would not be fatal to the enforcement of the lien if libelant were otherwise entitled to it before the hearing, but would only be pertinent to the matter of costs. Clark v. Five Hundred and Five Thousand Feet of Lumber (C. C. A.) 65 F. 236; Munson Steamship Line v. Glasgow Navigation Co. (C. C. A.) 235 F. 64. However, such a delivery as entitled the libelant to its freight was effected at the time of the purchase by claimants, who accepted delivery on board the barge although the master retained sufficient possession thereafter to support the lien until the libel was filed.

The claim of estoppel is likewise without merit. It is true that the master of the barge failed to inform the representatives of claimants, when they boarded the barge to examine the grain, that the freight had not been paid and a lien for its payment would be asserted against the cargo. Even assuming that in some circumstances an estoppel in favor of the purchaser would arise from this

---

[1] Among the cases relied upon on this point are: Chesapeake Insurance Company v. Stark, 6 Cranch, 268, 3 L. Ed. 220; Gilchrist, etc., v. Chicago Ins. Co. (C. C. A.) 104 F. 566; Hume v. Frenz, etc. (C. C. A.) 150 F. 502; The Poznan (C. C. A.) 9 F.(2d) 838; United States v. Robins Dry Dock Co. (C. C. A.) 13 F.(2d) 808.

failure, yet it is ineffectual for such purpose in the face of the purchasers' having exacted a guaranty from the underwriters that they would not be held for the freight, and in the absence of any proof to the effect that they paid the purchase price of the grain before receiving notice of the claim for freight. There is no evidence as to when they paid the underwriters and nothing definite that they became absolutely bound to pay at any time. It does appear that they exacted a guaranty from the underwriters that they would not have to pay any freight. From these circumstances it is clear that there is no basis for estoppel. There was in our opinion no abuse of discretion in allowing interest on libelant's claim from the date of the completion of the unloading.

The decree is affirmed.