ARKADELPHIA MILLING COMPANY v. SMOKER MERCHANDISE COMPANY.

Opinion delivered July 10, 1911.

1. CARRIERS—LIABILITY FOR GOODS TRANSPORTED.—A common carrier owes the duty to carry goods safely and make proper delivery thereof at the point of destination, and during the course of transportation is an insurer of the goods against loss from any cause, with certain exceptions. (Page 42.)

2. SAME—WHEN CARRIER'S LIABILITY CEASES.—The liability of a common carrier ceases with the delivery of the goods at the point of destination according to the directions of the shipper, or according to the usage and custom of the trade at such destination. (Page 42.)

3. SAME—SUFFICIENCY OF DELIVERY.—A carrier is discharged from liability either when it makes actual delivery of freight by turning the possession over to the consignee or his duly authorized agent and giving him a reasonable time in which to remove the goods, or when it gives notice to the consignee or his duly authorized agent, if that is all that is practicable, of the arrival of the goods, and gives reasonable time for the consignee or his agent to remove same. (Page 42.)

4.  SAME—DUTY OF CONSIGNEE.—It is the duty of a consignee of goods to be in position upon their arrival to receive notice thereof, and when notified to be on hand and receive them. (Page 43.)

5.  SAME—ARRIVAL OF GOODS—TIME FOR REMOVAL.—Ordinarily, it is a question for the jury to determine, under all the facts and circumstances of each case, what is a reasonable time for the removal of goods at their destination; but when the facts are undisputed, it becomes a question of law for the court. (Page 43.)

6.  SAME—WHEN CARRIER'S LIABILITY ENDED.—When a railroad company gave the consignee's agent two days' notice of the arrival of goods, before they were destroyed by fire, and the evidence established that a day or a day and a half was a reasonable time to remove the goods, the delivery by the railroad company was complete, and it was not error to direct a verdict for the railroad company. (Page 43.)

7.  SAME—CITY DRAYMAN.—One who is engaged within a city in the business of carrying goods for others indiscriminately, and undertakes for compensation to transport personal property from one place to another for all persons, and by virtue of the public nature of his business is under obligation to carry for all alike, is a common carrier, and subject to the extraordinary liability imposed upon common carriers. (Page 44.)

8.  SAME—LIABILITY FOR DESTRUCTION OF GOODS BY FIRE.—Where a public drayman accepted goods from a railroad company, took possession of the car in which they had been shipped, and began the removal of the goods therefrom, it became liable as an insurer for the subsequent loss of the goods by an accidental fire. (Page 45.)

9.  SAME—PROXIMATE CAUSE OF LOSS.—Where goods in the possession of a common carrier were destroyed by fire, it became liable therefor, though, but for the delay of the consignee in paying the drafts attached to the bill of lading, the goods would have been removed prior to the fire, as the proximate cause of the loss was not such delay, but the fire. (Page 46.)

Appeal from Clark Circuit Court; *Jacob M. Carter*, Judge; affirmed.

*Callaway & Huie,* for appellants.

The milling company, being draymen and engaged in the transportation of goods for hire, are common carriers. 2 Dana 430; 26 Am. Dec. 466; 116 Ky. 907; Hutch. on Car., 61.

*McMillan & McMillan,* for the Arkadelphia Milling Company.

This court will take that view of the evidence most favorable to the party against whom the verdict was directed. 89 Ark. 372. The milling company was entitled to the same time that the owners would have been entitled to for the removal of the flour from the car. 77 Ark. 487. As to what

this time is, see 60 Ark. 380; 89 Ala. 612; 97 Am. St. R. 76; 67 Am. St. R. 781; 15 *Id.* 426.

*W. E. Hemingway, E. B. Kinsworthy, W. V. Tompkins* and *James H. Stevenson,* for St. Louis, Iron Mountain & Southern Railway Company.

The railway company's duty was discharged when it delivered the goods to the agent of the consignee. 119 Ga. 604; 46 S. E. 830; 17 Ill. App. 325; 110 N. Y. 170; 46 N. Y. 578; 38 S. C. 365; 17 S. E. 147; 72 Ill. App. 105. The carrier is not an insurer against loss by accident after notice and a reasonable time in which to remove the goods. 44 N. Y. 505; 133 Mich. 187; 94 N. W. 739; 27 R. I. 231; 61 Atl. 695; 94 Mich. 133; 55 N. W. 918; 74 Am. St. 320; 89 Wis. 598; 62 N. W. 536; 52 Ark. 26; 60 Ark. 380; 17 Wend. 179; 31 Am. D. 297; 50 N. Y. 121; 62 Ill. App. 618; 28 Ala. 167; 29 So. 203; 30 N. Y. Supp. 903; 48 N. Y. Supp. 242; 49 N. Y. 223; 30 Col. 77; 69 Pac. 578; 97 Am. St. 76.

FRAUENTHAL, J. These were four separate suits instituted by the respective plaintiffs below against the defendants, the St. Louis, Iron Mountain & Southern Railway Company and the Arkadelphia Milling Company, as common carriers for the recovery of the value of certain merchandise which was lost while in the course of transportation. The four cases were consolidated for the purpose of trial, and, after the introduction of all the testimony by the parties, the court directed the jury to return a verdict in favor of the St. Louis, Iron Mountain & Southern Railway Company, and against the Arkadelphia Milling Company, for a recovery in favor of the respective plaintiffs for the amounts of their several claims.

The plaintiffs were engaged in the mercantile business in the city of Arkadelphia, and, through a broker of the White Springs Milling Company, which was located at White Springs, Mo., they, in conjunction with other merchants of said city, made separate purchases about August 25, 1909, of a lot of flour and feed stuff which in the aggregate amounted to one carload. The entire shipment was then delivered by the White Springs Milling Company to the St. Louis, Iron Mountain & Southern Railway Company at White Springs, Mo., in one car, to be carried by it to Arkadelphia; and a bill of lading

was issued therefor in which the shipment was consigned to shipper's order, with directions to notify J. W. Patterson, who was one of the purchasing merchants. Invoices for the several amounts of goods purchased by each of the merchants, including the plaintiffs, were by the White Springs Milling Company attached to separate drafts drawn by it on each of them, and all of these drafts were then attached to the bill of lading, and sent to the Elkhorn Bank, located at Arkadelphia, for collection.

The Arkadelphia Milling Company was engaged in the business of transporting goods at the city of Arkadelphia, and this portion of its business was known as and called the Arkadelphia Transfer Company, and will be referred to by that name. It owned a number of transfer wagons, and was engaged in hauling for hire goods and merchandise from the depot to the merchants in said city whose places of business were situated some distance from the depot, and also in hauling goods from these places of business to the depot, as well as from place to place in the city. It was engaged regularly in conveying goods as a business, and not occasionally between said places. It held itself out to the public to transport goods in this way indiscriminately, and undertook for hire, and was under obligation, to carry goods for all persons who chose to employ it. According to the testimony of the manager of the transfer company, it represented and was the agent of the merchants in Arkadelphia for the purpose of receiving from the railroad company goods which were consigned to them, and it carried same to their various places of business. In this way it represented upon this occasion the plaintiffs, as well as the other merchants, relative to this shipment.

According to the custom and usage of the trade at that place, the manager of the transfer company would go each morning to the depot and inquire if any shipments had arrived; and, upon learning that shipments had arrived, he would, upon securing proper release of the goods, transport same to the merchants. In cases where shipments were made with drafts attached to bill of lading, he would by telephone notify the bank holding the drafts, who would then see the merchants and collect same. Upon making such collection, the bank

would turn over the bill of lading, duly indorsed by the shipper, to the transfer company, who would surrender same to the railroad company, and the goods would then be turned over by the railroad company to the transfer company, who would transport same to the merchants.

It appears from the testimony on the part of the railroad company that the shipment in question arrived at Arkadelphia on the morning of August 31, 1909, and that its agent notified the manager of the transfer company of its arrival about eight o'clock of the morning of that day; and that the car containing the goods was placed upon a house track for unloading, and was at that place at 7 o'clock A. M. of September 1, 1909. There is, however, a conflict in the testimony as to when the transfer company was notified or learned of the arrival of these goods; but the evidence on the part of the transfer company shows that it probably learned of the arrival of the car containing the goods on September 1, 1909, and that it unquestionably was notified and learned of its arrival not later than eight o'clock on the morning of September 2, 1909. The manager of the transfer company testified that at that hour he communicated with the bank holding the bill of lading and the drafts, and notified it of the arrival of the shipment. And the undisputed evidence shows that the car was on the house track where, according to custom and usage, it was placed for unloading not later than 7 o'clock A. M. of September 2, 1909.

The bank made collection of the draft on the morning of September 2, and the manager of the transfer company testified that it turned over to him the bill of lading, duly indorsed by the shipper, at about four o'clock P. M. of September 2, 1909, and that at that hour he surrendered it to the railroad company, and thereupon obtained the goods and began unloading and transporting same at four o'clock P. M. of September 2. It continued to unload and transport the goods from that time until between four and five o'clock P. M. of September 3, 1909, when the car, and the goods remaining therein, were destroyed by fire. At that time the greater portion of the goods had been removed from the car, and some portions of plaintiffs' goods were destroyed, for which these suits were brought. The fire originated at about 3:30 P. M. of September 3, in a roller mill situated a short distance from the depot, and spread to

the depot and this car.   The fire occurred through no fault of any of the parties to this suit, and the question involved herein is, upon whom shall the loss of the goods fall?

1.   The railroad company was a common carrier of goods, and as such undertook to transport this shipment from White Springs to Arkadelphia.   The law not only imposed upon it the duty to carry the goods safely, but it made it also responsible for the proper delivery thereof at the point of destination, and made it during the course of transportation an insurer of the goods against loss from any cause, with certain exceptions. This extraordinary liability as an insurer of the goods continued until it made proper delivery thereof at the point of destination.   2 Hutchinson on Carriers, § 662; 2 Parsons on Contracts, § 183; *Chicago, R. I. & P. Ry. Co.* v. *Pfeifer*, 90 Ark. 524; *Stimson* v. *Jackson*, 58 N. H. 138; *Louisville & N. Ry. Co.* v. *Gilmer*, 89 Ala. 534.

The liability of the common carrier ceases with delivery of the goods at the point of destination according to the directions of the shipper, or according to the usage and custom of the trade at such place of destination.   This delivery may be actual, or it may be constructive; and in either case the liability of the carrier terminates with such delivery.   An actual delivery of goods is made when the possession is turned over to the consignee or his duly authorized agent and a reasonable time has been given him in which to remove the goods.   When such delivery is thus made, the carrier is fully discharged from further liability.   *Southern Exp. Co.* v. *Everett*, 37 Ga. 688; *Brunswick & W. Ry. Co.* v. *Rothchild*, 119 Ga. 604.   To constitute constructive delivery, the carrier must give notice to the consignee or his duly authorized agent, if that is at all practicable, of the arrival of the goods, and must also give a reasonable opportunity and time thereafter for the consignee or his agent to remove same.   When that is done, the liability of the carrier is terminated, whatever its liability may otherwise be.

In the case of *Railway Co.* v. *Nevill*, 60 Ark. 375, this court held (quoting syllabus) that "the liability of a railroad company as insurer of goods received for shipment continues after their arrival at their destination until the consignee has had reasonable time to remove the goods after notice to do so, or after reasonable effort by the company to give him such

notice." This has been the settled doctrine of this court fixing the time of the termination of the contract of carriage by a delivery which will relieve the carrier from further liability as such. *Ark. So. Ry. Co.* v. *German Nat. Bank*, 77 Ark. 482.

But this extraordinary liability which the law imposes upon a common carrier as an insurer of the goods cannot be continued at the option or to suit the convenience of the consignee or his agent. The duty to take and receive is as imperative upon the consignee and his agent as it is upon the carrier to deliver. It is the duty of the consignee to act promptly in taking and removing the goods after due notice, and if he fails to do so, whatever duty may rest upon the carrier in relation to the goods thereafter, its liability as an insurer thereof is by such failure terminated. It is the duty of the consignee to be on hand and to receive the goods after due notice, and it is his duty to be in a position upon the arrival of the goods to receive notice thereof and to act promptly in taking and removing them. *St. Louis, I. M. & S. Ry. Co.* v. *Towne*, 93 Ark. 430; *Chicago, R. I. & P. Ry. Co.* v. *Nuesch*, 99 Ark. 568; *Richardson* v. *Goddard*, 23 How. 28; *Tarbell* v. *Royal Exchange Assn.*, 110 N. Y. 170.

Ordinarily, it is a question for the jury to determine, under all the facts and circumstances of each case, as to what is reasonable time for the removal of the goods. But when the facts are undisputed, then it becomes a question of law for the court to decide what is a reasonable time for such removal. *Chicago, R. I. & P. Ry. Co.* v. *Nuesch, supra.*

In the case at bar, the undisputed evidence shows that it would take about one day to remove the goods, and at the most not longer than one and one half days, hauling the same with one team in the manner done by the transfer company. It is, however, questionable whether a shorter time under the circumstances of this case would not have been a reasonable time in which to have removed the goods. The undisputed evidence shows further that the transfer company was the agent of the consignees of this shipment to receive notice of its arrival and to take and remove same. The testimony of the manager of the transfer company tended to show that he probably received notice of the arrival of these goods on September 1, 1909, and the uncontroverted testimony is that he knew and

was notified of their arrival at eight o'clock on the morning of September 2. The fire destroyed the goods between four and five o'clock of September 3, 1909, and therefore more than one and a half days after the manager of the transfer company, who was the agent of the consignees, knew of the arrival, and after, according to his own testimony, he had notified the bank thereof. At the time of such fire, therefore, delivery of the goods by the railroad company was complete whereby its liability as an insurer of the goods had terminated. Under the uncontroverted testimony adduced in the case, the court was correct in directing a verdict in favor of the railroad company.

2. The liability of the Arkadelphia Milling Company to the plaintiffs depends upon its relation to them and the character of the business in which it was engaged, that is, whether it was a common carrier and incurred the liability as such by the undertaking it assumed. In order to constitute one a common carrier, the mode of transporting the goods which he employs is immaterial. Persons who engage in the business of transporting goods from place to place in a city in drays or transfer wagons may be common carriers. In the case of *Fish* v. *Chapman*, 2 Ga. 349, it is said: "A common carrier is one who undertakes to transport from place to place for hire the goods of such persons as think fit to employ him. Such are the proprietors of wagons, barges, lighters, merchant ships or other instruments for public conveyance of goods."

In Story on Bailments, § 495, it is said: "To bring a person under the description of common carrier, he must exercise it as a public employment; he must undertake to carry goods for persons generally, and he must hold himself out as ready to engage in the transportation of goods for hire as a business, and not as a casual occupation *pro hac vice*."

In the case of *Robinson* v. *Hickman*, 2 Dana 430, it is said: "One who undertakes for hire or reward to transport goods of all such as choose to employ him, from place to place, is a common carrier, and this includes draymen and cartmen who undertake as a common employment to carry goods from place to place for hire. The mode of transportation is immaterial." Angell on Carriers, § 870; 1 Hutchinson on Carriers, § 68; *Beckman* v. *Shouse*, 5 Rawle (Pa.) 179; *Jones* v. *Voorheis*, 10 Ohio 145;

*Farley* v. *Lavary* (Ky.) 47 L. R. A. 383; *Jackson Iron Works* v. *Hulbert,* 158 N. Y. 34.

But, in order to constitute one a common carrier, the business as such must be regular and customary in its character, and not casual only. An occasional undertaking to carry goods will not make one a common carrier. But the business of carrying must be conducted as a business, and must be of such a general and public nature that a person carrying it on is bound to convey goods of all persons indifferently who offer to pay for the transportation thereof. Where, therefore, one is engaged in the business of carrying goods for others indiscriminately, and undertakes for compensation to transport personal property from one place to another for all persons, and by virtue of the public nature of his business is under an obligation to carry for all alike, and not merely at his own option, then he is a common carrier, and is subject to the extraordinary liability imposed upon common carriers. 1 Hutchinson on Carriers, § 48.

And this rule applies alike to draymen and transfer companies who are engaged in hauling goods from one place to another in a city as it does to carriers by rail or by water.

Under the testimony adduced in this case, we think that the transfer company was engaged in the carrying business as an habitual employment, and that it possessed all the characteristics and came within the description of a common carrier of goods. Its liability as a common carrier began when it accepted and received the goods situated in the car on the house track, which was the place that was commonly used for unloading goods. That liability commenced when it took possession of the car, and began actual removal of the goods therefrom, and continued until it had completed the carriage by the actual delivery of the goods to the plaintiffs at their places of business.

In speaking of when the liability of a common carrier commences, the rule is thus stated in 1 Hutchinson on Carriers, § 124: "The long established and familiar rule as to the warehouseman, that his liability 'commences as soon as the goods arrive at his warehouse and the crane of the warehouse has been applied to them to raise them into the warehouse, has been applied to the common carrier under similar circumstances, and the delivery to him and his acceptance of the

goods held to commence from the moment he or his servants undertake to load them from the conveyance of another carrier upon his own and for that purpose have attached his tackle to them.'"

The testimony on the part of the transfer company shows that it received the goods for carriage on September 2, at 4 o'clock P. M., and then began to remove them and continued the removal until September 3, when the goods sued for were destroyed by fire. At the time of the fire it had taken possession and control of the goods. It had no warehouse in which the goods could be stored, but for its own convenience it used the freight car placed upon the house track as a place of storage while transporting the goods to the business houses of the plaintiffs. The railroad company had made complete delivery of the goods, because a longer time had elapsed than that which was reasonably necessary in order to remove the goods after notice of their arrival had been given, and delivery was made to the transfer company for the purpose of making the further carriage by it. The goods were therefore under the sole control and in the possession of the transfer company in the course of carriage when they were destroyed, and it was under the extraordinary liability as an insurer thereof at that time. It was therefore liable for the loss of the goods.

It is also urged by counsel for the Arkadelphia Milling Company that plaintiffs are not entitled to recover herein because they delayed making payment of the drafts attached to the bill of lading, and thereby delayed its surrender to the railroad company and the receipt of the goods by the transfer company, and thus delayed the removal of the goods prior to the time of the fire. But we do not think that the delay in paying the drafts can be considered as the proximate cause of the loss of the goods. A new cause here intervened which resulted in the loss of the goods that was wholly disconnected with the failure of the plaintiffs to pay the drafts sooner and in having the bill of lading turned over at an earlier time. The proximate cause of the loss was the fire, for which none of the parties to this suit was in any way responsible. *Martin* v. *Ry. Co.,* 55 Ark. 510; *James* v. *James,* 58 Ark. 157. The liability of the transfer company grows out of the fact that the goods were at the time of their destruction in its possession in the course

of carriage, and that it had assumed, by virtue of its business, liability for their loss occurring during such carriage from such cause.

It is also urged by the Arkadelphia Milling Company that the amount of the goods owned by each of the plaintiffs, and which was actually destroyed by the fire, was not shown in the testimony. It was in effect conceded that all the goods represented by the invoices attached to the drafts were shipped in the car. These invoices were turned over to the manager of the transfer company at the time he received the bill of lading. After the fire, this manager checked the goods which were actually taken from the car, and this showed the amount of the remainder of the goods which were destroyed. This testimony, we think, conclusively showed the amount of the loss of each plaintiff.

We are therefore of the opinion that the court did not err in directing the verdict in favor of the plaintiffs and against the Arkadelphia Milling Company for their several claims. The judgments are affirmed.