CHICAGO MILL & LUMBER COMPANY *v.* JOHNSON.

Opinion delivered May 6, 1912.

1. MASTER AND SERVANT—NEGLIGENCE OF FELLOW SERVANT—INSTRUCTIONS.—In an action by a servant to recover for injuries caused by the negligence of a fellow-servant, where the evidence showed that the fellow-servant owed plaintiff no duty save to use ordinary care after discovering his peril, an instruction which permitted a recovery regardless of whether plaintiff's peril was discovered by the fellow-servant was erroneous. (Page 76.)

2. INSTRUCTIONS—SUFFICIENCY OF OBJECTION.—Where appellant asked a correct instruction, which was given, this was tantamount to a specific objection to a conflicting instruction on the same subject given at appellee's instance. (Page 77.)

3. SAME—CONFLICT.—Conflicting instructions should not be given. (Page 78.)

4. MASTER AND SERVANT—INJURIES TO SERVANT—INSTRUCTIONS.—In an action by a servant to recover for injuries alleged to have been caused by fellow-servants who knew of his dangerous position, an instruction that the master would be liable if the fellow-servants knew of plaintiff's dangerous position, or by the exercise of ordinary care could have had that knowledge, was erroneous. (Page 78.)

Appeal from Mississippi Circuit Court, Chickasawba District; *Frank Smith*, Judge; reversed.

STATEMENT BY THE COURT.

Defendant is a corporation engaged in the sawing and manufacturing of lumber at Blytheville, in Mississippi County, Arkansas. Plaintiff was in its employ. He brought this suit for damages, alleging that while the plaintiff was engaged in the performance of his duties as "tripper," a slab, being conveyed by live rollers from the saw to the tripper chain or conveyor, became fastened in the tripper chain, and it was plaintiff's duty to remove the slab and readjust it, and while engaged in the performance of that duty it was the duty of Frank Sherrod, the edgerman, and also of John Young, the off-bearer, to throw the lever and deaden the live rollers and stop their movement to prevent injury to the plaintiff; that, notwithstanding this fact, and knowing the plaintiff's danger, which was to them apparent, they sent a slab or board moving down the live rollers while plaintiff was engaged in the performance of his duty removing the slab that had become fastened in the chain, and that said board or slab moving down the live rollers struck the plaintiff and crushed his arm and wrist.

The answer denied the material allegations of the complaint, and set up assumption of risk and contributory negligence.

The general superintendent of the defendant described the mill and machinery where Johnson worked as follows:

"The mill sets north and south. The saw is in the north end, and the roller system extends from the saw south. It is 108 feet long, thirty-six inches high, and forty-two inches wide. The rollers are twelve inches in diameter, thirty-six inches long, and are set four feet apart. The system is divided into two sections, and each section is driven independently of the other. The first section is sixty feet long, and extends from the saw to a point a trifle south of the edger tripper, and contains sixteen rollers. It has no connection with the other section. It is controlled by a lever located at the point where the off-bearer stands.

"The second section commences at a point just south of the edger tripper, and extends two rollers beyond the transfer to the trimmer. It is approximately forty-four feet long, it contains twelve rollers. There is a passage way between the two sections, which is covered by an apron. This apron could

be lifted so as to permit of a clear passage. The lever that controls the second section is located at the south end of the edger table. Just above Johnson's position when tailing the edger, there is a hand-hold used for tripping the transfer that carries slabs from the live rollers to the slasher-chains and by them to the slab saws. If this hand-hold or rope were extended to the floor, it would touch a point less than twelve inches from the lever that controls the second section. Within eighteen inches is a foot trip used for transferring lumber from the live rollers to the tripper table.

"When the lever is pulled, it not only stops the rollers of the second section, but it stops the slab chains also. The power operates on the live rollers by what is commonly termed a double beveled friction. No roller can turn independently of the others, and they can not be turned by hand at all. The chains that divert from the roller system to the edger are located in the first section, and are controlled by a pedal located where the edgerman stands. The live rollers are laid into the surface or top of the table and extend about an inch above it. A man standing in Johnson's position while tailing the edger could reach three of the controlling levers mentioned above."

The plaintiff describes the manner of his injury as follows: "Sometimes a slab would get caught under the slab chains, and it was my duty to get them out. On the second day of my last employment I was injured while removing a slab from these chains. It had a sharp point which caught under the chains. I noticed it flopping under the chains, and the block-setter and off-bearer motioned to me to get it out. When I crossed over the live roller run, I looked to see if the edger had his board up. The board was up, and I saw that the next good plank was going to the edger. I thought that all the good plank were going that way, and that nothing would come on me. If the board had been kept up, nothing could have reached me. I clamped my arms around the slab that was caught and was trying to pull it out. Another piece that was coming down the live rollers struck my left arm just above the wrist and injured it. This could have been prevented by the off-bearer stopping the rollers or reversing them. It could have been prevented by the edgerman leaving the check board up. I did not know that the check board was

down. It was the duty of the off-bearer and edgerman to protect me, as indicated above. On other days when I was removing slabs that had hung in the chains they had protected me by pushing other slabs from the roller system to the floor. When the assistant foreman employed me, he told me that if any slabs got tangled under the chains I was to straighten them out. I was the man in danger, and the off-bearer and edgerman had objects by them to protect me; that is what they had them for, and there was nothing by me to protect myself.

"The rollers from the saw to the slab-chain were controlled by one lever, which was operated by the off-bearer. The rest of the rollers were controlled by one lever, which was located a little back of my position in tailing the edger. I had absolute and entire control of the slab chains. A rope hung down just over my head, and by pulling this rope the slab chains were raised above the surface of the roller system so as to engage whatever material was passing down the rollers and divert to the east to the slab saws. When the rope was released, the slab chains dropped back below the surface of the roller system. I do not know whether there was any way to stop the slab chains from running. If there was at that time, I didn't know it. The power was still operating on the slab chains at the time I attempted to remove the slab that had gotten caught under one of them. I could have gotten the slab out easier if the power had been cut off. I didn't ask any one to release the power from those chains before I attempted to take the slab out. The off-bearer could have stopped the slab rollers down to the slab chains, but I didn't ask him to do this. I simply gave him the signal that I was going over there; I simply motioned that I was going to take the slab out. The rollers of the section where the slab was caught could have been stopped then. I didn't expect to get hurt. I knew there was danger in going in there, or I would not have given the signal. The lever by the off-bearer controlled the rollers down to the slab chains; and the lever, about eight feet back of where I stood when tailing the edger, controlled them for the rest of the distance. No one had ever instructed me to use that lever, and I had never used it. The lever near the off-bearer controlled the rollers where I was hurt."

The appellee was asked this question: "Q. When a

slab would hang that way, and you would go to release it, after you received the signals to release it and started to perform your duty in releasing it, what was the duty, if any, of the off-bearer and the edgerman? A. The duty of the off-bearer would be to stop those rollers, and also, if it had gone too close to me, to pull this lever and reverse them and bring the slab back, and the edgerman's duty would be to throw this board up to stop the plank and keep them from running in on me."

Further questions and answers were as follows:

"Q. If by chance it passed the board before they caught it, then how could it be stopped? A. It could not be stopped after it passed the board that way at all unless it had not got far enough but that the off-bearer could have used the lever and reversed it. Q. In case it did do that, how did you manage it? What was the rule? A. Before when I would get out slabs—the day before I got hurt—they had on other days when there were would be a slab hung under this first chain, when I went to get them out—if they were slabs, he pushed them out on the floor. There was several on the floor at the time this one hung that had been pushed off on the floor while I was getting one out—some three or four."

Appellee further testified that the boss showed him when he put him to work how to trip the slabs. He says: "He showed me to pull this rope and trip the slabs, and he said that good plank would come down, and that the off-bearer would show me; and this foot trip that sets over to the right, you use that like this, and he showed me to trip those planks to the trimmer; but this rope trip and foot trip that trips the plank to the trimmer is all he ever showed me how to handle or told me to have anything to do with—the trimmer trip and the slab trip."

Frank Sherrod testified substantially as follows: "I was running the edger where Johnson was hurt. I saw a slab get hung under one of the slab chains, and saw Johnson go over to get it out, but I didn't know whether he got it out or not. I didn't see any piece of timber go down the live rollers to where Johnson was while he was trying to get the slab out. I saw a slab start down the roller, but the off-bearer stopped the roller. If I had kept the check-board up, nothing could pass. I knew Johnson was trying to get the slab out."

The record shows the following:

"Q. Didn't you say if you had kept it up he would not have got hurt, and it was your duty to do that? A. Yes, sir. Q. He was trying to get the slab out? A. Yes, sir. Q. It was your duty to keep the check board up while he was trying to get the slab out? A. Just for the sake of keeping him from getting hurt; there was no compulsion on me to keep the board up; just the kindness I have toward anybody I kept the board up. Q. Just the kindness of your heart? A. Yes, sir; to keep anybody from getting hurt. Q. What was it that caused you to put it down—a change of heart? A. The last slab had been sawed and the log turned. Q. Then you let it down? A. Yes, sir. Q. Knowing that the man was trying to get the slab out? A. Yes, sir; I knew that he was trying to get out the slab."

He further testified as follows: "I was not looking at him when he got hurt. I knew he was over there trying to get the slab out. Didn't know whether a piece of slab or timber went down on him or not. I didn't keep the bumper up. The saw continued to run. While the saw is running, pieces of timber will go down the live rollers unless the off-bearer stops the rollers. I saw a plank or slab start down the roller after Johnson had gone over there, but the off-bearer stopped the roller and stopped that piece. That is the only piece I saw start down while Johnson was there. I saw that piece stop, and I paid no further attention to it. I never looked around again because I had a board in my hand and was doing my own work."

John Young testified as follows: "I was off-bearer in March, 1910. My duty was to off-bear the lumber as it came from the saw, and to see that it went down the live rollers. I also stopped and started the rollers whenever necessary. I saw Johnson come over to the slab-chains to take a slab out. If anything struck Johnson, I didn't see it. Nothing went down the live rollers while he was there except a board, and the edgerman diverted it from the rollers and ran it through the edger. No board went down to where Johnson was. My side of the rollers was moving all the time he was there. He didn't say anything about being hurt, and I didn't know that he claimed to be hurt until he came back to the mill next morn-

ing.   When Johnson was removing a slab, it was my duty to keep off-bearing there.   It was my duty to reverse the rollers whenever I saw anybody get in a jam down there.   When a man is trying to pull a slab out, he is in a jam.   I saw Johnson; knew he was in there getting a slab out, and I didn't reverse the rollers.   If a slab went down there (while Johnson was getting a slab out), I didn't see it.   Nothing goes down past the chains where he was pulling the slab out except the slabs. Not all the planks were run through the edger.   If the edgerman wants them to pass, he simply lets the bumper down. Lots of times he does not put them through the edger.   I don't know whether a piece of plank or slab went down and hit Johnson or not.   I didn't see it.   If a man is pulling a slab out and a plank is going down on him, it will be my duty to stop the rollers until the edgerman could push it off; it was my duty to do this if I saw a man was in position to be hurt, but otherwise it was not my duty.   It was not my duty to stop and reverse the rollers when nothing was going down.   I didn't see anything going down the rollers while Johnson was there except a plank, and that went through the edger."

E. M. Howard was running the drag-saw in March, 1910.   It was elevated some eighteen or twenty inches above the floor on which Johnson worked.   He says he saw Johnson go over to take a slab from under the slab-chains.   He got over the rollers and caught the slab and pulled it, and the chains kind of moved and the slab kind of kicked up the end, and he took hold of it and took the slab out.   Witness saw the slab go under the chain.   The chain was raised before the slab on it, and it was a sharp-ended slab, and it went under the chain.   Then Johnson went over to take it out. The chain was stopped when he first went to the slab, but when he moved it, the chain started and kept going.   The chain caught the slab and took if on, and the end that Johnson had hold of kicked up; it kind of "flopped."   Witness could not see whether it hit Johnson or not.   He had the slab up in his arms pulling it out.   Witness was looking at him during all of this time.   No other slab or board went down the live rollers to where Johnson was while he was getting the slab out.   Witness had seen three or four slabs catch in the chain. He was about seventy or eighty feet from Johnson.   It hap-

pened about 3 o'clock in the afternoon. Johnson didn't make any complaint that afternoon of being hurt. The first witness knew that he claimed to be hurt was when he told witness the next morning.

We will set out and comment upon such of the instructions as may be necessary in the opinion. After instructing the jury, the court submitted certain interrogatories to be answered by the jury. These interrogatories, and answers thereto, are as follows:

Interrogatory No. 1. If Johnson had stopped the second section of the live rollers and the slab chains, would the injury have happened?

Answer. Yes.

Interrogatory No. 2. Was Johnson struck by a board or slab impelled along the live rollers?

Answer. Yes.

Interrogatory No. 3. Did Sherrod know that Johnson was about to be struck by a slab or board impelled along the live rollers in time to avert it?

Answer. No.

Interrogatory No. 4. Did Sherrod negligently fail to keep check-board raised?

Answer. Yes.

There was a verdict in favor of the plaintiff in the sum of $2,000. Judgment was rendered in favor of plaintiff for that sum, and appellant duly prosecutes this appeal.

*Coleman & Lewis*, for appellant.

1. Instruction 16 is not only inherently wrong, but there is no evidence on which to base it. The proof shows that Sherrod did not actually know that appellee was in a position of danger, and that there was nothing which in the exercise of ordinary care would have put him on notice. The instruction is especially erroneous in that it permits a recovery if the off-bearer and edgerman, or either of them, knew that appellee was in a position to be injured or in the exercise of ordinary care should have had that knowledge. 86 Ark. 306; 82 Ark. 522; 79 Ark. 225; 62 Ark. 164; 93 Ark. 34. As between Sherrod and Johnson, fellow-servants, the only duty they owed one another was that each should exercise such

care as a man of ordinary prudence would exercise under the circumstances to avoid injuring the other; and there could be no liability for the injury to Johnson which Sherrod did not himself cause, and merely on the ground that he failed to avert it, unless he actually knew of Johnson's peril and had the power and opportunity to prevent it. 82 Me. 240; 22 Minn. 185; 5 Thompson on Neg., § 5777; 25 Kan. 62.

2. It is erroneous to give conflicting instructions. Instruction 12, given at appellant's request, a correct declaration of law, is in direct conflict with instruction 16.

3. It was error in the court to ignore appellant's defense of assumption of risk in its instructions 1 and 2. And instruction 6 errs in assuming that it was negligence on the part of Sherrod to let the bumper down, notwithstanding the proof shows he was unaware of appellee's peril.

*J. T. Coston*, for appellee.

1. Instruction 6 correctly states that appellee had the right to presume that his fellow-servants would be guilty of no negligence imperiling his safety. 124 S. W. 241. This language, in connection with instructions 1 and 2, left it entirely to the jury to decide whether in fact it was negligence for Sherrod to let the bumper down. In view of the fact that the court expressly charged the jury that the instructions did not "assume anything to be one way or the other except where the parties concede the fact to be one way or the other," if the language of instruction 6 and other instructions was not sufficiently clear, it should have been met by specific objection. 125 S. W. 136; 133 S. W. 1134; 56 Ark. 602; 123 S. W. 797; 121 S. W. 947.

2. Under the act of 1907 a servant does not assume the risk of the negligence of fellow-servants. 135 S. W. 818; 140 S. W. 389; 124 S. W. 240; 129 S. W. 533.

3. The objection that instruction 16 conflicts with instruction 12 is raised here for the first time. If the former correctly states the law, the court will not reverse on account of the conflict with the latter which is favorable to the appellant.

WOOD, J., (after stating the facts). Appellee grounds his right to recover upon the allegation that "it was the

duty of Frank Sherrod, the edgerman, and also of John Young, the off-bearer, to throw the lever and deaden the live rollers to prevent injury to plaintiff, and that, knowing the plaintiff's danger, which was to them apparent, they sent a slab or board moving down the live rollers while plaintiff was engaged in the performance of his duty removing the slab that had become fastened in the chains, and that said board or slab moving down the live rollers struck the plaintiff and crushed his arm and wrist."

Giving the testimony of appellee and that of the other witnesses the strongest probative force possible in his favor, it tends to show that the edgerman and the off-bearer, fellow-servants of appellee, owed him the duty to exercise ordinary care to prevent injury after his peril was discovered—not before. It was the duty of appellee, according to his testimony, to remove any slab that might be caught under the slab chains. This carried with it the corresponding duty to discover when any slabs were so caught and to exercise ordinary care for his own protection while removing the slabs. This ordinary care for his own protection required that he notify those in charge of the rollers and the edger of the fact that he was going to take out any slab that might be fastened under the slab chains in order that they might use the means which he says they had at hand to protect him. He recognized that this was his duty, for he says, "I gave him (the off-bearer) the signal that I was going over there. I simply motioned that I was going to take out the slab. I knew there was danger in going in there, or I would not have given the signal."

The undisputed evidence shows that it was the duty of the appellee to discover and to remove slabs that had become fastened under the slab chains. There is no testimony to warrant a finding that this duty devolved upon any one else, nor that it was the duty of any one else to exercise ordinary care to discover when the slabs were fastened under the slab chains, or to discover when appellee was going to proceed to remove them.

Under the allegations of his complaint and the undisputed evidence, the only theory upon which appellee could recover at all is that the edgerman and the off-bearer, after discov-

ering that he was about to remove a slab, and that he was in a position of danger, failed to exercise ordinary care to protect him from injury. But instructions 1, 2, 5 and 6, given at the request of the plaintiff, allowed recovery regardless of whether or not Sherrod, the edgerman, knew that the plaintiff was in peril at the time he was undertaking to extricate the slab. The instructions, in this particular, were abstract. They should have embodied the idea that if Sherrod, the edgerman, knew that plaintiff was trying to extricate a slab, and knew that he was in a position of peril while so doing, and then negligently failed to keep up the check board or bumper for his protection, appellant would be liable.

It can not be said that the undisputed evidence showed that Johnson, while removing the slab, was in a position of peril, and that the edgerman and off-bearer had knowledge thereof, for the edgerman testified that he "did not see any piece of timber go down the live rollers to where Johnson was while he was trying to get the slab out." "I saw," he says, "a slab start down the roller, but the off-bearer stopped the roller." Again: "I saw a plank or slab start down the roller after Johnson had gone over there, but the off-bearer stopped the roller and stopped that piece. That is the only piece I saw start down while Johnson was there."

And the off-bearer testified: "If a slab went down there while Johnson was getting a slab out, I didn't see it. It was not my duty to stop and reverse the rollers when nothing was going down. I didn't see anything go down the rollers while Johnson was there except a plank, and that went through the edger."

This testimony tends to show that neither the edgerman nor the off-bearer knew that appellee was in a perilous position while he was removing the slab.

In instructions 11 and 12, given at the request of appellant, the court told the jury, in substance, that if the off-bearer and the edgerman did not see the plaintiff at or just before the time he alleged he was injured, and didn't know he was in a position in which he might be injured, then he could not recover on account of anything done or omitted by the off-bearer and the edgerman. These instructions were correct, and were

tantamount to a specific objection (for the error indicated) to the instructions given above at the instance of appellee.

The instructions given at the instance of the appellee, in the particular mentioned, were erroneous, and were in conflict with those given at the request of appellant. Conflicting instructions should not be given. *Southern Anthracite Coal Co.* v. *Bowen*, 93 Ark. 140.

The court erred in giving instruction No. 16, which is as follows:

"You are instructed that the only allegation of negligence in the complaint is that it was the duty of the off-bearer and edgerman to throw the lever and deaden the live rollers, so as to prevent any slab from going down the live rollers and striking the plaintiff while he was removing the slab which had caught under the slab chains, and that the off-bearer and edgerman, knowing that the plaintiff was trying to remove the slab which was caught, failed to deaden the live rollers, and thereby permitted another slab to pass down the live rollers and strike the plaintiff. Unless, therefore, you find from a preponderance of the evidence that the off-bearer and edgerman, or either of them, knew that the plaintiff was in a position to be injured by a slab passing down the live rollers, or in the exercise of ordinary care should have had that knowledge, and that it was the duty of the one having such knowledge to stop the live rollers or keep up the bumper, and he negligently failed to stop them, and thereby permitted a slab to be propelled against the plaintiff, and this was the sole cause of the injury complained of, then your verdict should be for the defendant."

The appellant objected to the clause "or in the exercise of ordinary care should have had that knowledge." The insertion of this language in the instruction was erroneous, for the reason, as already stated, that appellee, in his complaint, based his right to recover upon the allegation that the off-bearer and the edgerman did have knowledge of plaintiff's danger, not that "in the exercise of ordinary care they should have had knowledge" of his danger. And, furthermore, the undisputed evidence, as we have seen, showed that no duty devolved upon the off-bearer or the edgerman to exercise ordinary care to discover appellee's situation while

removing the slab. It devolved upon the appellee himself to notify the off-bearer and the edgerman of the peril he was in while removing the slab; and, under the most favorable view of the evidence, the duty of the off-bearer and edgerman to protect him did not begin until they had been apprised of his danger. There was no affirmative duty on their part to exercise care to become aware of such danger.

We find no error in the refusal of the court to grant other prayers of appellant.

It follows from what we have said that the answers to interrogatories 3 and 4 propounded by the court to the jury were conflicting and inconsistent, for if Sherrod, the edgerman, did not know that Johnson was about to be struck by a slab or board impelled along the live rollers in time to avert it, as the jury found, then he was not negligent in failing to keep the checkboard raised. If Sherrod did not know that Johnson was about to be struck by a slab, it would be impossible for him to be negligent in failing to prevent that which he did not know, and which, as we have stated, it was not his duty to anticipate. There can not be any actionable negligence where there is no duty to be performed by the party charged with the negligence. The inconsistent and conflicting responses to the court's interrogatories must have been caused by the erroneous and conflicting instructions, which were well calculated to confuse and mislead.

For the errors mentioned the judgment must be reversed, and the cause remanded for a new trial.