ALPHA ZETA CHAPTER OF PI KAPPA ALPHA FRATERNITY, an Unincorporated Association, by James DAMRON, Its President *v.* Sharon K. SULLIVAN and Ken PRINCE, Individually and as Co-Administrators of the ESTATE of Todd Alan PRINCE, Deceased

86-311 740 S.W.2d 127

Supreme Court of Arkansas
Opinion delivered November 23, 1987
[Rehearing denied December 21, 1987.]

*Pope, Shamburger, Buffalo, & Ross*, by: *Robert T. Ross*, for appellants.

*Robert A. Parker*, and *Ted Boswell*, by: *Robert A. Parker*, for appellees.

STEELE HAYS, Justice. Appellees are the parents of Todd Alan Prince, deceased. They brought this action individually and as co-administrators for the wrongful death of their son. Appellant is the Alpha Zeta Chapter of Pi Kappa Alpha Fraternity, an unincorporated association, by its president, James Damron.

Appellant sponsored a hayride on the evening of October 3, 1984 in appreciation of the "Little Sisters" of the fraternity, a group of women students helpful to individual members with their studies and to the fraternity with its projects. Arrangements were made between Trent Trumbo, a member of the fraternity, and John Reed of John Reed Company for Reed to furnish two vehicles suitable for hayrides. Reed furnished the hay and two drivers as well. Reed's regular work was renting construction equipment with twenty-four hour mechanic and wrecker service. Reed handled an average of five hayrides a year in conjunction with his regular business. After determining the number of persons, the length of time involved, and the amount of hay needed, Reed arrived at a price for the hayride.

Todd Prince was eighteen years old when he enrolled as a freshman at the University of Arkansas in the fall of 1984. He was not a member of PiKA but was invited to the hayride along with several other rushees to see whether he would be interested in

joining if the members were similarly inclined. It is clear that intoxicating beverages were being used rather freely as the students, perhaps 100 in number, awaited the arrival of the trucks, due around 8:00 o'clock. It is not clear whether these beverages were supplied by the fraternity or by individuals. There was testimony that someone at the party purchased a half pint of bourbon for Todd Prince with money Todd supplied.

The trucks arrived, took on their passengers and began a circuitous ten mile trip to the Gateway Farm where the party was to be held. Two kegs of beer were furnished by the fraternity at the farm. The return to the campus began about 11:30 p.m. by way of Mount Comfort Road. Along a straight stretch of that road the driver of one of the trucks, Melton Newman, responded to calls from several of the passengers to stop so that they might relieve themselves. There was no shoulder at that point and Newman stopped on the pavement while passengers dispersed, some in the direction of a clump of trees on the far side of the road.

As the party was thus engaged, Norman Hutton approached in his automobile traveling in the opposite direction. As Hutton passed the trailer, at a speed variously estimated at 40 m.p.h. to 70 m.p.h., his vehicle struck Todd Prince as Prince was walking across the roadway toward the trees. Hutton did not stop, though he returned a short time later, explaining that he thought he had struck a bundle of hay thrown from the trailer as he passed. The investigating officer testified that Hutton had a strong odor of alcohol about him and spoke with slurred speech. Hutton admitted to having just drunk one pitcher of beer and part of a second.

As a result of the impact Todd Prince was critically injured. He was taken first to the Washington Regional Hospital and then by Med-Flight to the Baptist Medical Center in Little Rock where, on October 9, he expired.

In June 1985 Todd Prince's parents filed this wrongful death action on behalf of themselves and Todd's two sisters against the national Pi Kappa Alpha Fraternity, the local Pi Kappa Alpha Chapter, The Pi Kappa Alpha Monticello Corporation, John Reed, Melton Newman and Norman Hutton. The complaint sought compensatory damages of $535,000 and punitive damages of $1,500,000. The national fraternity and Pi Kappa Alpha Monticello Corporation were dismissed from the action by a

directed verdict and the jury returned a verdict against the remaining defendants, apportioning 95% of the fault to the fraternity, 2% to John Reed, 1% to Melton Newman, 1% to Norman Hutton and 1% to Todd Prince. The verdict awarded compensatory damages of $30,000 to the estate, $100,000 to each of Todd's parents and $25,000 to each sister. Punitive damages of $250,000 were assessed against the fraternity, $2,500 against Norman Hutton and a like amount against Melton Newman.[1]

Pi Kappa Alpha has appealed from the judgment entered on the verdict alleging seven errors by the trial court: (1) The trial court erred in submitting the case to the jury on a "dramshop" instruction which is not a basis for liability; (2) The trial court erred in giving instruction number 9 which allowed the jury to find Melton Newman to be the agent of the fraternity; (3) The trial court erred in holding that John Reed Company was a common carrier, thereby involving the "highest degree of care" duty; (4) There was no substantial evidence to support a finding that Melton Newman was subject to the control of the fraternity; (5) There was no substantial evidence to support an award of punitive damages against Melton Newman or Pi Kappa Alpha; (6) The verdicts were excessive as a matter of law; and (7) The trial court erred in failing to direct a verdict against Jodi Prince (Todd's sister) on the issue of damages.

I

*The trial court erred in submitting the case to the jury on a "Dramshop" instruction, which is not a basis for liability.*

Over the objection of the defendants the trial court gave plaintiff's requested instruction No. 14:

Evidence that Alpha Zeta Chapter of Pi Kappa Alpha Fraternity furnished intoxicating liquor to Todd Alan Prince, a minor, has been presented to you. You may not find Alpha Zeta Chapter guilty of negligence for that reason. However you may consider that evidence in determining whether Alpha Zeta Chapter was negligent under

---

[1] During jury deliberation John Reed and Melton Newman settled the claims of the plaintiffs for $50,000.

the circumstances, as I have defined the term "negligence" in previous instructions.

■■ We think it was error to instruct the jury in this fashion. The instruction is plainly confusing. It tells the jury it may consider the fact that the fraternity furnished liquor to Todd Prince in determining whether the fraternity was negligent, but that the jury may not find the fraternity negligent for that reason. We believe it is expecting too much of the jury to require it to intelligently decipher that contradiction. It is settled law that it is prejudicial error for the court to give instructions which are directly conflicting and calculated to mislead the jury. *Chicago Mill & Lumber Co. v. Johnson*, 104 Ark. 67, 147 S.W. 86 (1912); *McCurry v. Hawkins*, 83 Ark. 202, 103 S.W. 600 (1907); *Capitol Old Line Ins. Co. v. Gorondy, Adm'x.*, 1 Ark. App. 14, 612 S.W.2d 128 (1981).

Beyond that, we believe the instruction runs counter to that group of cases wherein we have held that one who furnishes alcohol to a minor or to someone who is inebriated is not liable by so doing. We have embraced that principle even where the violation of a statute accompanied the furnishing of alcohol. In *Carr v. Turner*, 238 Ark. 889, 385 S.W.2d 656 (1965), a tavern operator furnished alcoholic drinks to its co-defendant, Ruby Turner, in violation of a statute requiring liquor to be sold in packaged containers for consumption off the premises. Ms. Turner was permitted to become visibly intoxicated and to leave the premises in her car. She promptly ran into a parked vehicle and injured the occupant. The unanimous opinion in *Carr v. Turner* reviewed three earlier cases by this court. In one it was held that a saloonkeeper was not negligent for furnishing liquor to one who became intoxicated and injured another; in the other two cases we held that providing liquor to one person was not the proximate cause of an injury to a third person.

Reviewing the majority rule on this issue in light of two pertinent Arkansas statutes, one prohibiting a barkeeper from supplying someone who is intoxicated, and the other prohibiting *any person* from selling or giving liquor to a minor, the court in *Carr* stated:

There is significant distinction between these cases and the one now before us. In all the decisions cited the liability to

the injured person fell solely upon one engaged in the sale of alcoholic beverages. Our statute is not so narrow. It applies to any person who sells or gives away intoxicating liquor to a minor or to an inebriate. By its terms it is equally applicable to a liquor dealer and to a host who serves cocktails in his own home. Perhaps the legislature did not mean for the law to be so sweeping in its scope, but we must give effect to the statute as we find it.

■ The *Carr* opinion makes it clear by express language that if a Dramshop Act is to be adopted in Arkansas it should be by legislative action rather than by judicial interpretation. No legislation has been forthcoming in the twenty years since *Carr* v. *Turner* was decided.

More recently, in *Milligan* v. *County Line Liquor, Inc.*, 289 Ark. 129, 709 S.W.2d 409 (1986), we affirmed the granting of summary judgment in favor of the appellee County Line Liquor Store, charged with negligence in selling beer to a minor in violation of Ark. Stat. Ann. § 48-901 (Repl. 1977). It was again emphasized that if a Dramshop Act were to become the law in Arkansas it must come by legislative action.

Two recent cases have rejected appeals to deviate from the *Carr* v. *Turner* and *Milligan* v. *County Line Liquor Store* decisions. In *Yancey* v. *The Beverage House of Little Rock, Inc.*, 291 Ark. 217, 723 S.W.2d 826 (1987) the appellee twice sold alcohol illegally to a minor, the second time after he was intoxicated. The minor then had an accident and two teenaged passengers were killed. In *First American National Bank of North Little Rock* v. *Associated Hosts, Inc.*, 292 Ark. 445, 730 S.W.2d 496 (1987) a "happy hour" customer consumed more than a dozen drinks in three hours. Leaving the bar in an intoxicated condition he fell and injured himself. We affirmed the summary disposal of both cases for lack of a remedy under the law.

■ We conclude that the jury should not have been told it could consider the fact that the fraternity had furnished intoxicating liquor to a minor in determining whether the fraternity was negligent.

We will discuss the remaining points insofar as necessary to guide the court and counsel on retrial.

## II and III

*The trial court erred in giving instruction number 9 which allowed the jury to find Melton Newman to be the agent of Alpha Zeta.*

*The trial court erred in holding that John Reed Company was a common carrier thereby invoking the "highest degree of care" duty.*

Points II and III are closely related and can be discussed simultaneously. By instructing the jury that as a common carrier Reed owed his passengers "the highest degree of care," a higher duty than that of ordinary care was imposed. It was error to instruct the jury in that manner.

A constituent shared by common carriers is an indiscriminate readiness to carry all persons (or property) who choose to avail themselves of such carriage. In *Arkadelphia Milling Co.* v. *Smoker Merchandise Co.*, 100 Ark. 37, 139 S.W. 680 (1911), we defined common carriers:

> But in order to constitute one a common carrier, the business as such must be regular and customary in its character, and not casual only. An occasional undertaking to carry goods will not make one a common carrier. But the business of carrying must be conducted as a business, and must be of such a general and public nature that a person carrying it on is bound to convey goods of all persons indifferently who offer to pay for the transportation thereof. Where, therefore, one is engaged in the business of carrying goods for others indiscriminately, and undertakes for compensation to transport personal property from one place to another for all persons, and by virtue of the public nature of his business is under an obligation to carry for all alike, and not merely at his option, then he is a common carrier and is subject to the extraordinary liability imposed upon common carriers.

 A good working definition of common carriers appears

584

in 13 Am. Jur. 2d, Carriers, § 2:

> A common carrier may be defined, very generally, as one who holds himself out to the public as engaged in the business of transporting persons or property from place to place, for compensation, offering his services to the public generally. The dominant and controlling factor in determining the status of one as a common carrier is his public profession or holding out, by words or by a course of conduct as to the service offered or performed, with the result that he may be held liable for refusal, if there is no valid excuse, to carry for all who apply. The distinctive characteristic of a common carrier is that he undertakes to carry for all people indifferently, and he is regarded, in some respects, as a public servant.

Private carriers are defined, *id.*, § 8:

> A private carrier is one who, without making it a vocation, or holding himself out to the public as ready to act for all who desire his services, undertakes by special agreement in a particular instance only, to transport property or persons from one place to another either gratuitously or for hire.

John Reed was regularly engaged in renting construction equipment, not in the carriage of goods or passengers. He testified that he handled about five hayrides a year on the average. He negotiated each hayride on an ad hoc basis and if he chose not to handle a particular hayride he was free to decline. He did not advertise in the newspaper or yellow pages for hayrides and there was no proof that he held himself out as accepting all comers in this area. His testimony that he accepted or rejected this type of business as he chose was not refuted. Those instructions telling the jury that Reed owed the passengers "the highest degree of care" should not have been given.

IV

*There was no substantial competent evidence from which a properly instructed jury could find Melton Newman to be under the control of Alpha Zeta Chapter and the court erred by instructing the jury that it should hold Alpha*

*Zeta Chapter liable if it found Melton Newman to use the highest degree of care.*

While, as we have said, it was error to instruct that Melton Newman was required to exercise the highest degree of care, it was not error to submit the issue of agency to the jury. Whether the overall circumstances were such that Melton Newman was the agent of the fraternity in the operation of the lowboy trailer was, we think, a fact question. There was testimony that the fraternity rented the drivers as well as the trucks, that the stop on Mount Comfort Road was made in response to calls from the passengers. Newman testified that "they said stop and I was working for them and when they said stop, you know, I would stop." Coupled with those circumstances is the testimony of John Reed that, "as to whether I instructed Mr. Newman or Mr. Hammon that they were to follow the instructions of the person in charge at Pi Kappa Alpha, they would have to. There would be many things they would have to do."[2]

We believe whether under the totality of the circumstances Melton Newman was the agent of the appellant while engaged in the hayride was an issue for the jury to resolve. The issue is not whether the agent is actually directed, but whether the right to control exists. *Evans* v. *White*, 284 Ark. 376, 682 S.W.2d 733 (1985).

V

*There is no substantial competent evidence to sustain an award of punitive damages against Alpha Zeta or Melton Newman.*

Because the boundary between gross negligence and conduct that can be characterized as willful and wanton is indistinct, it is necessarily subjective in part. The two-fold intent behind punitive damages is to punish the wrongdoer and to exemplify such conduct for others to note. Negligence alone, however gross, is not enough to sustain punitive damages.

---

[2] R. p. 781.

There must be some element of wantonness or such a conscious indifference to the consequences that malice might be inferred. In other words, in order to warrant a submission of the question of punitive damages, there must be an element of willfulness or such reckless conduct on the part of the defendant as is equivalent thereto. *Hodges* v. *Smith*, 175 Ark. 101, 298 S.W. 1023 (1927); *Dalrymple* v. *Fields*, 276 Ark. 185, 633 S.W.2d 362 (1982).

In *Wallace* v. *Dustin*, 284 Ark. 318, 681 S.W.2d 375 (1984), we stated:

An award of punitive damages is justified only where the evidence indicates that the Defendant acted wantonly in causing the injury or with such a conscious indifference to the consequences that malice might be inferred. *Freeman* v. *Anderson*, 279 Ark. 282, 651 S.W.2d 450 (1983). "Before punitive damages may be allowed it must be shown that in the absence of proof of malice or willfulness there was a wanton and conscious disregard for the rights and safety of others on the part of the tortfeasor." *Dalrymple* v. *Fields*, 276 Ark. 185, 188, 633 S.W.2d 362, 363 (1982).

In *National By-Products, Inc.* v. *Searcy House Moving Company, Inc.*, 292 Ark. 491, 731 S.W.2d 194 (1987), this court vacated an award of punitive damages quoting from *Ellis* v. *Ferguson*, 238 Ark. 776, 385 S.W.2d 154 (1964):

Wantonness is essentially an attitude of mind and imparts to an act of misconduct a tortious character, such conduct as manifests a 'disposition of perversity.' Such a disposition or mental state is shown by a person, when, notwithstanding his conscious and timely knowledge of an approach to an unusual danger and of common probability of injury to others, he proceeds into the presence of danger, with indifference to consequences and with absence of all care. It is not necessary to prove that the defendant deliberately intended to injure the plaintiff. It is enough if it is shown that, indifferent to consequences, the defendant intentionally acted in such a way that the natural and probable consequence of his act was injury to the plaintiff.

We have reviewed the proof carefully and giving the circumstances surrounding this unfortunate incident their highest probative value we are not convinced that willfulness can be inferred. We concede it was not unforeseeable that an episode of the sort that did occur might follow stopping on the highway while numbers of young people, some plainly inebriated, spread out to find a place to urinate. Even so, it is clear that Melton Newman was guided by a motivation to find a suitable place where the objective could be safely accomplished, and chose a straight, relatively level stretch of road. Hence, it cannot be said that care was altogether wanting. That Newman might have made a better choice, or anticipated a careless motorist, does not translate into wantonness. There was proof that he was seen drinking beer at the party, a relevant fact which we must accept over the denial that he and others offered to that testimony, *Arkansas Louisiana Gas Co. v. Hutcherson*, 287 Ark. 247, 697 S.W.2d 907 (1985), but there was no suggestion that he was affected by alcohol, nor any testimony from which it might be so inferred.

Nor can we say that the fraternity's part in the entire affair, given the state of the law, subjects it to punitive damages on these facts. If the law recognizes no cause of action in the first instance for giving alcohol to a minor, even in excess, on what basis can it be said that punitive damages will lie for doing so?

Accordingly, we conclude that on the proof demonstrated in this record, the issue of punitive damages should not have been submitted to the jury.

## VI and VII

*The awards of damages to the plaintiffs were excessive as a matter of law.*

*The court erred in failing to direct a verdict against Jodi Prince on the issue of damages.*

Appellant urges that the award for mental anguish of the parents and two sisters of Todd Prince are excessive. *Peugh v. Oliger*, 233 Ark. 281, 345 S.W.2d 610 (1961). Since the case is remanded for a new trial, we need not weigh the proof of how Todd's death affected the three family members who testified in

light of the several factors to be considered in reviewing damages for mental anguish. See *Martin* v. *Rielger*, 289 Ark. 292, 711 S.W.2d 766 (1986) and *Kelley* v. *Wiggins*, 291 Ark. 280, 724 S.W.2d 443 (1987).

■ Appellant points out that one of Todd's sisters, Jodi Prince, did not testify. Were the case being otherwise affirmed, it would be necessary to vacate any award for mental anguish on behalf of Jodi Prince. In *Growth Properties I* v. *Common*, 282 Ark. 742, 669 S.W.2d 447 (1984), we set aside a judgment for mental suffering for a family member who did not testify, saying:

> The overtones of conjecture which attach to claims of mental suffering unaccompanied by physical injury have led to the view that mental anguish may not be inferred on behalf of someone who fails to testify concerning his own experience. See *Dale* v. *Sutton*, 273 Ark. 396, 620 S.W.2d 293 (1981) and *Peugh* v. *Oliger, Adm'x*, 233 Ark. 281, 345 S.W.2d 610 (1961).

Assuming the identical issue was presented on retrial, appellant's motion for a directed verdict on this point would require affirmative action.

Reversed and remanded.